RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0191p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

INGRID ANDERSON, individually and parent on behalf of C.A.; HOUSING OPPORTUNITIES MADE EQUAL, INC.,

*Plaintiffs-Appellants,*

*v.*

CITY OF BLUE ASH,

*Defendant-Appellee.*

No. 14-3754

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:14-cv-00151—Timothy S. Black, District Judge.

Argued: March 5, 2015

Decided and Filed: August 14, 2015

Before: COLE, Chief Judge; MOORE and CLAY, Circuit Judges.

―――――――――――

## COUNSEL

**ARGUED:** Kathleen A. Farro, MANLEY BURKE, LPA, Cincinnati, Ohio, for Appellants. Mark A. Vander Laan, DINSMORE & SHOHL, LLP, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Kathleen A. Farro, Timothy M. Burke, MANLEY BURKE, LPA, Cincinnati, Ohio, for Appellants. Mark A. Vander Laan, Bryan E. Pacheco, DINSMORE & SHOHL, LLP, Cincinnati, Ohio, for Appellee. Kevin J. Truitt, OHIO DISABILITY RIGHTS LAW AND POLICY CENTER, INC., Columbus, Ohio, for Amicus Curiae.

———————————

**OPINION**

———————————

COLE, Chief Judge.   This appeal is the latest chapter in an ongoing dispute between Ingrid Anderson and the City of Blue Ash, Ohio, over whether Anderson can keep a miniature horse at her house as a service animal for her disabled minor daughter, C.A.  C.A. suffers from a number of disabilities that affect her ability to walk and balance independently, and the horse enables her to play and get exercise in her backyard without assistance from an adult.  Since Anderson first acquired a horse in 2010, she has struggled with the City for permission to keep it at her house.  In 2013, the City passed a municipal ordinance banning horses from residential property and then criminally prosecuted Anderson for violating it.  Anderson's defense was that the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101, *et seq.*, and the Fair Housing Amendments Act ("FHAA"), 42 U.S.C. § 3601, *et seq.*, both entitle her to keep the horse at her house as a service animal for C.A.  Rejecting those arguments, the Hamilton County Municipal Court found Anderson guilty.

Anderson brought this action against the City in federal district court, again arguing that the ADA and FHAA entitle her to keep her horse as a service animal for C.A.  She also claims that the City intentionally discriminated against her because of C.A.'s disabilities, in violation of both the ADA and the FHAA, and that the City's ordinance has had a disparate impact on C.A. and other disabled individuals, in violation of the FHAA.  The district court granted summary judgment to the City, finding that Anderson's claims were barred by claim and issue preclusion stemming from her Municipal Court conviction.

Because the fact-finding procedures available in a criminal proceeding in municipal court differ substantially from those available in a civil proceeding, Anderson's conviction has no preclusive effect on this lawsuit.  Furthermore, while there is no evidence that the City's actions were motivated by discriminatory intent against C.A. or had a disparate impact on disabled individuals, there are significant factual disputes regarding whether the ADA or FHAA require the City to permit Anderson to keep her miniature horse at her house.  We therefore reverse the district court's grant of summary judgment to the City on those claims.

**I. BACKGROUND**

**A.      Factual Background**

Ingrid Anderson lives in the City of Blue Ash, Ohio, with her disabled minor daughter, C.A.  C.A. has a variety of disabilities, including autism, seizures, chronic lung disease, gastroesophageal reflux, feeding and vision problems, severe allergies, attention deficit hyperactivity disorder, developmental delay, autonomic dysfunction, and tachycardia, among others.  Her disabilities make it difficult for C.A. to maintain her balance independently, particularly when she must change directions or navigate uneven surfaces.  Consequently, C.A. cannot effectively use her backyard for recreation and exercise without assistance.

While the traditional service animal is a dog, miniature horses are often used to provide assistance to individuals with disabilities.  *See generally* 28 C.F.R. § 35 app. A (2011) (specifically discussing miniature horses as service animals).  Miniature horses can be trained to provide many of the services commonly associated with service dogs, such as guiding individuals with impaired vision.  Like dogs, miniature horses can also be housebroken, and individuals with disabilities have taken them on trains and commercial flights.  Miniature horses may be preferable to service dogs for "large stature individuals" and "individuals with allergies, or for those whose religious beliefs preclude the use of dogs." *Id.*  Additionally, because they are stronger than most dogs, miniature horses may be preferable for "providing stability and balance for individuals with disabilities that impair the ability to walk, and supplying leverage that enables a person with a mobility disability to get up after a fall." *Id.*  Miniature horses also have significantly longer lifespans than dogs, and are able to provide service for more than twenty-five years while dogs can only provide service for approximately seven.  This allows a disabled minor to have a single miniature horse throughout his or her childhood, without having to periodically replace aging service dogs.  Therapy with miniature horses is sometimes referred to as "equine" or "hippotherapy."

In 2010, C.A. began working with miniature horses as a form of therapy at the Hamilton County Parks facility and in the backyard of her house.  By gripping the mane of her horse, C.A. is able to move about outside for recreation and exercise.  Dr. Ronald Levin—the physician who

recommended that C.A. work with miniature horses as a form of therapy—described some of the benefits C.A. receives from working with a miniature horse in her backyard:

> Hippotherapy is beneficial for [C.A.] as it incorporates several avenues of traditional therapy including physical, occupational, speech and language. Specifically, this may address [C.A.'s] physical development through learning more about balance and control. Hippotherapy addresses many aspects of gross and fine motor skills that can be applied in everyday life. Cognitively [C.A.] may benefit from learning and practicing communication skills, as well as increase her social skills, self-esteem and independence.

(Levin Letter, November 3, 2010, R. 10-5, PageID 717.)  C.A. fatigues easily:  Dr. Levin stated that "just a drive across town to receive therapy can wipe her out leaving no energy to enjoy this therapeutic and recreational activity."  (*Id.*)  As a result, Anderson began keeping a miniature horse at her Prospect Avenue residence in the City so that C.A. could benefit from this therapy at home.

In August 2010, Daniel Johnson, the City's Community Development Director and Zoning Administrator, began receiving complaints from Anderson's neighbors about the miniature horse at her house.  Anderson's neighbors complained about excessive waste from the horse and other animals kept on the property.  At least one complaint questioned whether C.A. was actually using the horse for therapeutic purposes, and noted that the condition of Anderson's property was devaluing the neighborhood because of "health issues" and an "extremely offensive . . . smell of horse manure that emanates from the piles in [her] backyard" so severe that the complaining neighbor's children could not play outside.  (Email Complaint, August 12, 2010, R. 8-1, PageID 123–24.)

Johnson ordered Anderson to remove the horse from her property.  Anderson appealed that order, first to the Blue Ash Board of Zoning Appeals ("BZA"), which affirmed, and then to the Blue Ash City Council.  The Council ultimately decided not to enforce Johnson's order, citing a letter it received from Dr. Levin in which he supported "the housing of a miniature horse for in-home therapy support for [C.A.]"  (Levin Letter, November 3, 2010, R. 10-5, PageID 717.)  By "in-home therapy" Dr. Levin was not suggesting that the therapy take place indoors, but outdoors "at the home" so that the therapy "can be utilized in a schedule that is more conducive to [C.A.]"  (*Id.*)

Anderson began keeping a second miniature horse at her house in 2011.  Johnson ordered Anderson to remove the second horse, but Anderson refused.  Instead, she submitted a letter from Dr. Derek Fletcher—another physician recommending that C.A. work with miniature horses as a form of therapy—supporting "the housing of two miniature horses" for C.A.'s therapy.  (Fletcher Letter, August 16, 2011, R. 8-1, PageID 138.)  Unpersuaded by Dr. Fletcher's letter, Johnson again ordered Anderson to remove the second horse in February 2012.

In early 2012, the Hamilton County Public Health Department received a complaint concerning five dogs, "horses, goats, chickens and pigs living within [Anderson's] home and causing unsanitary conditions within."  (Stone Report, March 5, 2012, R. 8-1, PageID 139.)  Johnson ordered Anderson to remove the other farm animals from her property in February 2012.  A subsequent investigation by a health inspector revealed excessive animal waste on Anderson's property, though it was cleaned up by the time she removed the pig from her house in mid-March 2012.

Anderson appealed the removal order to the BZA, arguing that the ADA entitled her to keep both miniature horses at her house.  In April 2012, the BZA held an evidentiary hearing before issuing a written opinion affirming the order that Anderson remove one of her two horses.

Anderson appealed the BZA decision to the Blue Ash City Council, again arguing that the ADA entitled her to keep both miniature horses at her house.  After analyzing the ADA's requirements and C.A.'s circumstances, the Council issued a written decision finding that the horses "are clearly not service animals, either under the applicable federal statutory guidelines or the case law analyzing the issue."  (Council Decision, September 13, 2012, R. 8-1, PageID 136.)  The Council affirmed the BZA's decision that one of Anderson's horses must be removed.  Anderson did not appeal the Council's decision.  Around this time, the City received at least two complaints from individuals living in Anderson's neighborhood, each describing unsanitary conditions at her house and questioning whether the horses were actually being used for C.A.'s therapy.

In August 2012, after the Council's decision, Anderson and C.A. replaced their two miniature horses with Ellie, the miniature horse at issue in this appeal, and moved to their current residence on Myrtle Avenue.  After completing several classes on how to train miniature horses

for therapy, Anderson trained Ellie to assist C.A. in navigating her backyard, including by steadying C.A. while she is walking and helping her to stand after a fall.

On January 10, 2013, the Council passed Ordinance No. 2013-1, amending the City's municipal code "to prohibit keeping of farm animals at residences within the city." (Ordinance No. 2013-1, R. 2, PageID 49.) The ordinance specifically applied to horses, excepting those "[a]nimals which are otherwise specifically permitted elsewhere in the Municipal Code or permitted by Hamilton County, Ohio State, or Federal law." (*Id.*) On January 31, 2013, Johnson sent a letter to Anderson informing her that the new ordinance would come into effect on February 20, 2013, and that she would be cited for violating it if the miniature horse was still present on her property on or after that date.

In responding to an anonymous complaint on February 21, 2013, a police officer observed a miniature horse in Anderson's backyard. The officer asked Anderson to remove the horse from her property, and, initially, she complied. But while investigating a later complaint, an officer observed the horse at Anderson's residence on July 8 and again on July 16. On each occasion he cited Anderson for violating Ordinance 2013-1. Each citation was punishable by a $150 fine.

In the summer of 2013, Housing Opportunities Made Equal, Inc. ("HOME"), a non-profit, fair-housing-assistance organization in the Cincinnati area began providing services to Anderson. HOME advises clients of their rights to fair housing and helps them file fair housing claims. HOME advised Anderson of her rights under the FHAA and the ADA and "assist[ed] her with filing a Fair Housing Act violation" against the City. (Municipal Transcript, R. 8-4, PageID 273.) One of HOME's compliance managers, Brandon Craig, contacted several City officials, including Johnson and the prosecutor handling Anderson's citations, informing them of Anderson's rights related to service animals and, specifically, miniature horses under the FHAA and the ADA.

Anderson responded to the two citations by email on July 24, 2013. She specifically asserted that both the FHAA and the United States Department of Housing and Urban Development ("HUD") guidelines on assistance animals (interpreting the FHAA and the ADA)

entitled her to a "reasonable accommodation to keep the miniature horse for [C.A.]." (Anderson Email, July 24, 2013, R. 10-5, PageID 711.)

Anderson was tried on both citations in the Hamilton County Municipal Court on October 22, 2013. She did not deny that she kept the miniature horse, Ellie, at her house, but based her defense entirely on her position that the ADA and FHAA entitled her to keep the horse for C.A.'s therapy. Anderson was represented by counsel and presented several exhibits that purportedly described her rights under the ADA and the FHAA, including applicable HUD guidelines and ADA regulations on service animals. Anderson moved to dismiss the citations at the close of the prosecution's case, arguing that because the miniature horse is a service animal under the ADA, Ordinance 2013-1 could not apply to her. The motion was denied. During closing arguments, the prosecutor argued that the horse was not a service animal under the ADA. Anderson's counsel responded by arguing that the miniature horse was a service animal under federal law, and urged the Municipal Court to review the exhibits describing the relevant ADA and FHAA regulations.

On November 13, 2013, the Municipal Court found Anderson guilty on both citations. The court did not issue a written opinion, noting simply that it had reviewed all of the exhibits and conducted additional research. The court did not impose a fine for either conviction, and Anderson did not appeal.

In March 2014, after the onset of this litigation, Anderson asked her neighbors to sign letters supporting her efforts to keep Ellie at her house. In these letters, Anderson stated that she had secured a service to remove animal waste from her yard. Most of her neighbors, together with a few others from the community, signed letters in support.

### B.    Procedural Background

On February 18, 2014, Anderson, individually and on behalf of C.A., and HOME filed this suit against the City. They alleged that the City's refusal to permit Anderson to keep the horse at her residence violated her rights under the ADA and the FHAA. Anderson, C.A., and HOME also alleged that the City enacted and enforced Ordinance 2013-1 because of discriminatory animus against C.A., in violation of both the ADA and the FHAA, and that the

ordinance has had a disparate impact on C.A. and other disabled individuals in violation of the FHAA.  They sought declaratory and injunctive relief, along with compensatory damages, attorney's fees, and costs.

The City moved for summary judgment, arguing that claim and issue preclusion bar this lawsuit because of Anderson's criminal convictions for violating Ordinance 2013-1 and her administrative proceedings before the Blue Ash City Council in 2012.  The City also disputed the merits of the ADA and FHAA claims, contending that neither statute entitles Anderson to keep Ellie at Anderson's house.  The district court granted summary judgment to the City, finding that Anderson's convictions on the two citations barred this lawsuit based on claim and issue preclusion.  The district court also found for the City on the merits of the ADA and FHAA claims.  The plaintiffs appealed.

## II.  ANALYSIS

### A.     Standard of Review

We review the district court's grant of summary judgment de novo.  *Guyan Int'l, Inc. v. Prof'l Benefits Adm'rs, Inc.*, 689 F.3d 793, 797 (6th Cir. 2012).  "We also review de novo a district court's application of res judicata."  *Ohio ex rel. Boggs v. City of Cleveland*, 655 F.3d 516, 519 (6th Cir. 2011) (citation and internal quotation marks omitted).  Summary judgment is proper if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In determining whether the City met its burden on summary judgment, we view the evidence in the light most favorable to the plaintiffs and draw all reasonable inferences in their favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### B.     Claim and Issue Preclusion

Claim and issue preclusion generally prevent parties from raising an argument that they already fully litigated in an earlier legal proceeding.  "State-court judgments are given the same preclusive effect under the doctrines of res judicata and collateral estoppel as they would receive in courts of the rendering state."  *Boggs*, 655 F.3d at 519 (citation and internal quotation marks omitted).  "In other words, '[i]f an individual is precluded from litigating a suit in state court by

the traditional principles of res judicata, he is similarly precluded from litigating the suit in federal court.'" *Id.* (alteration original). "We look to the state's law to assess the preclusive effect it would attach to that judgment." *Id.* (citation and internal quotation marks omitted).

Under Ohio law, "[t]he doctrine of res judicata encompasses the two related concepts of claim preclusion, also known as res judicata or estoppel by judgment, and issue preclusion, also known as collateral estoppel." *O'Nesti v. DeBartolo Realty Corp.*, 862 N.E.2d 803, 806 (Ohio 2007). "Claim preclusion prevents subsequent actions, by the same parties or their privies, based upon any claim arising out of a transaction that was the subject matter of a previous action." *Id.* The doctrine also bars any subsequent action whose claims "could have been litigated in the previous suit." *Id.* "Issue preclusion, on the other hand, serves to prevent relitigation of any fact or point that was determined by a court of competent jurisdiction in a previous action between the same parties or their privies," and "applies even if the causes of action differ." *Id.*

The City contends that both claim preclusion and issue preclusion bar the plaintiffs' lawsuit because of (1) Anderson's administrative appeal to the Blue Ash City Council in 2012, and (2) her convictions for violating Ordinance 2013-1. First, we address the administrative appeal. It is true that "[r]es judicata, whether claim preclusion or issue preclusion, applies to quasi-judicial administrative proceedings" as long as "the parties have had an ample opportunity to litigate the issues involved in the proceeding." *State ex rel. Schachter v. Ohio Pub. Emps. Ret. Bd.*, 905 N.E.2d 1210, 1216 (Ohio 2009) (citation and internal quotation marks omitted). But a prior proceeding triggers res judicata only for claims that could have been decided in that proceeding and issues that were actually determined, *see O'Nesti*, 862 N.E.2d at 806, and the claims and issues in this case are not the same as those that were or could have been presented to the Blue Ash City Council in 2012.

The issue before us is whether federal law entitles Anderson to keep Ellie at her house on Myrtle Avenue. Anderson's appeal to the Council dealt with two different miniature horses at a different location, a residence on Prospect Avenue in Blue Ash. These distinctions are significant because the ADA regulations governing miniature horses call for a fact-specific inquiry into the characteristics of the particular animals in question, including their type, size, weight, and training, as well as the adequacy of the facilities where the horses are kept. *See*

28 C.F.R. § 35.136(i)(2). The FHAA also calls for a "highly fact-specific inquiry." *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 542 (6th Cir. 2014) (citation and internal quotation marks omitted). Thus the question in this case—whether the ADA or FHAA entitle Anderson to keep Ellie at her current residence—was not and could not have been answered in Anderson's appeal to the Blue Ash City Council, and therefore that proceeding has no preclusive effect on this lawsuit.

Anderson's convictions for violating Ordinance 2013-1, on the other hand, concerned the same horse and the same residence now at issue. While Anderson concedes that she raised both the ADA and FHAA as defenses during that proceeding, Anderson contends that res judicata does not bar her claims because she could not fully litigate them during her criminal trial. Specifically, she argues that she could not raise her ADA or FHAA claims nor seek declaratory, injunctive, or monetary relief as a defendant in a municipal court of limited jurisdiction.

We have recognized that "Ohio state courts generally frown upon the use of criminal proceedings to estop parties in subsequent civil proceedings." *Boone v. Spurgess*, 385 F.3d 923, 927 n.4 (6th Cir. 2004). The Supreme Court of Ohio has explained that this is because "[t]he qualitative differences between civil and criminal proceedings including the differing standards of proof, rules of discovery, and rules of evidence militate against giving criminal judgments preclusive effect in civil or quasi-civil litigation." *State ex rel. Ferguson v. Ct. of Claims of Ohio, Victims of Crime Div.*, 786 N.E.2d 43, 48 (Ohio 2003) (per curiam) (internal quotation marks and brackets omitted). This disfavor is not absolute, however, and the court has recognized that criminal proceedings can sometimes trigger res judicata in a subsequent civil suit:

> The Ohio Supreme Court has explicitly held that a convicted defendant is precluded under the doctrine of res judicata from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on appeal from that judgment.

*5455 Clarkins Drive, Inc. v. Poole*, 384 F. App'x 458, 463 (6th Cir. 2010) (per curiam) (internal quotation marks omitted).

Whether Ohio courts will give preclusive effect to a criminal proceeding in a subsequent civil suit turns on "whether the burdens of proof, discovery rules, evidentiary rules, procedure, or constitutional safeguards effective at the criminal stage could have affected that party's willingness or ability to pursue the argument at issue in a way that no longer obtained at the civil stage." *Id.* Thus, the Supreme Court of Ohio has held that an acquittal at a criminal trial did not bar relitigation of the defendant's innocence in a subsequent wrongful imprisonment action brought by that defendant because of "qualitative differences between civil and criminal proceedings." *Walden v. Ohio*, 547 N.E.2d 962, 966 (Ohio 1989). "In a civil proceeding, not only is the burden of proof usually different, it being placed upon plaintiff . . . but also the rules concerning trial procedure, discovery, evidence and constitutional safeguards differ in important aspects." *Id.* (internal quotation marks omitted). By contrast, that court held that a criminal conviction did preclude a subsequent civil action for post-conviction relief where the defendant sought to relitigate the validity of the criminal statute under which he had been convicted, and that legal challenge had been "fully litigated" during his prior criminal proceedings. *Ohio v. Szefcyk,* 671 N.E.2d 233, 235 (Ohio 1996).

Other Ohio courts have also recognized that the preclusive effect of a criminal judgment depends on whether qualitative differences between the criminal and civil proceedings affected the criminal defendant's willingness and ability to litigate fully the case or issues. In *Independence Excavating, Inc. v. City of Twinsburg*, No. 20942, 2002 WL 2009464, at *8 (Ohio Ct. App. Sept. 4, 2002), an intermediate appeals court held that a municipal conviction for violating a zoning ordinance precluded a company from later seeking a declaratory judgment that the zoning ordinance conflicted with state law because that issue could have been raised as a defense in the prior criminal proceeding. Acknowledging that "qualitative differences [between criminal and civil proceedings] are often relevant to determining the applicability of res judicata," the court held that "demonstrating a conflict between the city's ordinance and similar state legislation would not be affected by differences in discovery methods, privilege, or self-incrimination safeguards that normally differ between criminal and civil proceedings." *Id.*

Similarly in *Poole*, we distinguished between the preclusive effects Ohio gives to "*factual* determinations made in an earlier criminal proceeding" and "a *defense* that could have

been made" in that proceeding. 384 F. App'x at 462–63. In holding that an adult cabaret's conviction for violating a zoning ordinance precluded it from raising a First Amendment challenge to that ordinance in a subsequent civil suit, we held that:

> During their criminal proceedings, [the adult cabaret owners] indisputably could have raised their First Amendment claims, and appear to have had precisely the same opportunity and motivation to pursue them; their willingness and ability to do so were unaffected by the fact that the earlier proceeding happened to be a criminal trial. Moreover, they have made no argument that, as a practical matter, the differences between criminal and civil procedural or evidentiary rules denied them that opportunity to pursue their claims of facial invalidity.

*Id.* at 465 (footnote omitted). Thus both *Independence Excavating* and *Poole* determined the preclusive effects of a criminal proceeding on a subsequent civil action by asking whether the "qualitative differences" between those proceedings affected the litigant's willingness or ability to pursue the claim.

Taking into account these considerations, we conclude that Anderson's convictions for violating Ordinance 2013-1 have no preclusive effect on her ADA and FHAA claims here because the qualitative differences between the instant civil proceedings and her criminal trial in Municipal Court had different effects on her willingness and ability to litigate fully those issues in the prior proceeding. Unlike the plaintiffs in *Independence Excavating* and *Poole*, whose purely legal defenses could have been fully litigated during their criminal proceedings, Anderson's ADA and FHAA claims require fact-intensive inquiries that are greatly affected by the differences in the municipal criminal court's fact-finding procedures, particularly the lack of civil discovery. Thus Anderson's ability to pursue her claims was "qualitatively different" than it is here. Additionally, Anderson had less motivation to litigate fully her ADA and FHAA claims in the municipal court, where she was a defendant drawn involuntarily into those proceedings by the City's citations, faced only a small fine, and where the court had no authority to order the City to let her keep her horse at home. Accordingly, Anderson's claims are not precluded by res judicata, and we proceed to address the merits of the ADA and FHAA claims.

**C.** **ADA Claims**

*1. Reasonable Modification*

Anderson contends that the ADA and its implementing regulations require the City to make a reasonable modification to its "policies, practices, and procedures" to permit her to keep Ellie at her residence. The ADA prohibits public entities from discriminating against individuals with disabilities, including by:

> fail[ing] to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii). Regulations implementing the ADA require a public entity to make "reasonable modifications in policies, practices, or procedures to permit the use of a miniature horse by an individual with a disability if the miniature horse has been individually trained to do work or perform tasks for the benefit of the individual with a disability," provided that the horse and the requested modification also satisfy certain "[a]ssessment factors." 28 C.F.R. § 35.136(i)(1)–(2).

It is undisputed that C.A. is "an individual with a disability," but the district court granted summary judgment to the City on Anderson's ADA claim for a reasonable modification because it found that Ellie did not meet the ADA regulations' requirements and because it found that the regulations' "assessment factors" were not satisfied. On appeal, Anderson contends that there are disputed issues of fact material to both the ADA regulatory requirements for miniature horses and the related assessment factors that preclude summary judgment in favor of the City.

a. ADA Regulatory Requirements for Miniature Horses

The ADA regulations do not specify the amount or type of training that a miniature horse must undergo to qualify as a reasonable modification for a disabled individual, nor the amount or type of work or assistance that the horse must provide for his or her benefit. Courts have typically found that to qualify for a reasonable modification, an animal must be specially trained

to perform tasks directly related to a disability, contrasted with animals that have received only general training, provide only emotional support, or otherwise perform tasks not directly related to a disability. *See, e.g.*, *Lerma v. Cal. Exposition and State Fair Police*, No. 2:12-CV-1363, 2014 WL 28810, at *5 (E.D. Cal. Jan. 2, 2014) (finding that a puppy was not a service animal because it only received obedience training and was used only to help the plaintiff "get through the day and feel better, a type of emotional support and comfort, which is exactly the type of aid specifically excluded as work or tasks under" ADA regulations); *Rose v. Springfield-Greene Cnty. Health Dep't*, 668 F. Supp. 2d 1206, 1215 (W.D. Mo. 2009) (finding that a monkey was not a service animal because the tasks it performed did not "relate to [plaintiff's] disability" and merely provided comfort to the plaintiff, whose disabilities did not require a monkey to perform day-to-day activities).

On appeal, Anderson contends that her horse meets these requirements because she has individually trained Ellie to assist C.A. by steadying her as she walks so that she can enjoy independent recreation and exercise in her backyard. The City first contends that the horse does not qualify for a reasonable modification under the ADA and its implementing regulations because it does not help C.A. with her daily life activities (such as going to school), C.A. can walk without the horse, and the horse does not help C.A. inside the house. We are not persuaded by, nor do we find any authority to support, the proposition that an animal must be needed in all aspects of daily life or outside the house to qualify for a reasonable modification under the ADA. Many service animals are trained to provide specialized assistance that may be necessary only at certain times or places. *See* 28 C.F.R. § 35 app. A (discussing tasks commonly performed by service animals). For example, C.A. has a seizure-response dog that is specifically trained to assist her if she has a seizure while sleeping. This dog indisputably qualifies as a service animal despite the fact that it does not provide assistance to C.A. with any of her daily activities while she is awake or outside the house. Anderson has produced evidence that Ellie is trained to assist C.A. with beneficial exercise in her backyard, and she is no less qualified for a reasonable modification under the ADA simply because C.A. does not need her horse's assistance for all of her daily activities or when traveling.

The City also contends that Ellie has not been "individually trained to do work or perform tasks for the benefit of" C.A. because Anderson, the horse's primary instructor, holds no certification in service-animal training. But the ADA regulations have no certification requirement. Rather, the ADA asks whether the horse has been instructed on how to perform a task that assists an individual with his or her disability, so the instructor's lack of certification at best creates a factual dispute as to whether a horse's training was adequate. Here, Anderson testified that Ellie is trained to assist C.A. to overcome her mobility limitations by steadying her as she walks and helping her stand after she falls, tasks specifically listed by the ADA regulations as examples of ways that miniature horses can assist the disabled. *See* 28 C.F.R. § 35 app. A. Construed in Anderson's favor, this evidence satisfies the ADA regulations' requirement that the miniature horse be "individually trained to do work or perform tasks for the benefit of the individual with a disability." 28 C.F.R. § 35.136(i)(1).

b.  Assessment Factors

In addition to the requirement that miniature horses be trained to assist an individual with his or her disability, the ADA regulations also provide four "assessment factors" that "shall [be] consider[ed]" when determining "whether reasonable modifications in policies, practices, or procedures can be made to allow a miniature horse into a specific facility":

> (i) The type, size, and weight of the miniature horse and whether the facility can accommodate these features;
>
> (ii) Whether the handler has sufficient control of the miniature horse;
>
> (iii) Whether the miniature horse is housebroken; and
>
> (iv) Whether the miniature horse's presence in a specific facility compromises legitimate safety requirements that are necessary for safe operation.

28 C.F.R. § 35.136(i)(2). The district court found that these factors weigh against Anderson, noting that her house is on a lot that is smaller than miniature horses typically require, that Ellie is not housebroken, and finding that health complaints lodged against Anderson over the past several years suggest that the horse's presence would compromise the City's "legitimate health and public safety concerns." On appeal, Anderson contends that she has produced evidence that at least creates disputed issues of fact as to each of these factors.

With regard to the first factor, the City contends that Anderson's residence is too small to accommodate her horse, pointing out that Anderson has admitted that her yard is significantly smaller than would be ideal for an average miniature horse.  However, this factor calls for consideration of the "type, size, and weight" of the particular miniature horse at issue, not an average member of her species.  *See* 28 C.F.R. § 35.136(i)(2)(i).  Anderson has provided evidence that Ellie is uniquely suited for a smaller yard because her rear legs are deformed, thus reducing her need and ability to run.  Furthermore, Anderson testified that her backyard includes a shed "of a size and dimension to accommodate three miniature horses comfortably, and thus houses Ellie very comfortably and keeps her safe from the elements." (Anderson Aff., R. 10-2, PageID 692.)  This evidence is sufficient to show a factual dispute regarding the first assessment factor.

The City contends that the second and third factors weigh against Anderson and C.A. because they did not have sufficient control over Ellie, and that she was not housebroken. Anderson testified that she has sufficient control over her horse because she has trained Ellie to perform specific tasks for C.A.  In response, the City offered a sworn account of an incident in which C.A. attempted to demonstrate how she works with Ellie but was not able to do so, fell, and was stepped over by the horse.  Given the conflicting affidavits concerning the extent of Anderson and C.A.'s control over their horse, there is a genuine factual dispute over the second assessment factor that cannot be resolved on summary judgment.  Regarding the third factor, Anderson concedes that Ellie is not housebroken.  However, this does not automatically relieve the City from its obligation to make a reasonable modification because the assessment factors are not *prerequisites* for a reasonable modification, but are independent *factors* that shall be considered when evaluating whether a particular modification is reasonable for a particular animal.  The City provides no reason why Ellie's lack of control over producing waste indoors is relevant here, where the horse is never indoors and the requested accommodation is for the horse to assist C.A. and live outdoors in Anderson's backyard.

Finally, the City contends that the fourth factor weighs against Anderson.  It points to multiple citizen complaints concerning unsanitary conditions related to a number of animals on Anderson's property.  The City concludes from those complaints that the "miniature horse's

presence" at her house "compromises legitimate safety requirements" of the City's health code. *See* 28 C.F.R. § 35.136(i)(2)(iv). Anderson responds that these complaints do not accurately reflect the condition of her residence and that she has now secured a service to regularly remove animal waste from her yard. Additionally, Anderson emphasizes that there are no complaints from her current neighbors, most whom have signed letters in support of her efforts to keep Ellie at her house. Anderson points out that those conditions complained of arose from the concurrent presence of multiple farm animals at her house, combined with her previous failure to clean up effectively after them. Indeed, she notes that some of the complaints the City cites concerned only dog waste and were made at times when no horses were present at Anderson's house. Taken together, this evidence shows that there is a factual dispute over whether a single miniature horse at Anderson's residence would threaten the City's "legitimate safety requirements."

Anderson has produced evidence that it would be reasonable for her to keep Ellie at her residence and that all the requirements and assessment factors of the ADA regulations have been satisfied. The City has produced conflicting evidence, such as health complaints, and draws a different conclusion from the record, but weighing the City's evidence against the plaintiffs' is inappropriate on summary judgment. The Ninth Circuit has observed that the "determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry." *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 844 (9th Cir. 2004) (internal quotation marks omitted). Viewing all facts and drawing all reasonable inferences in Anderson's favor, and given the "highly fact-specific" nature of the reasonableness inquiry, we conclude that there are disputed issues of material fact as to the reasonableness of Anderson's requested modification.

Because we find that disputed issues of fact preclude summary judgment in favor of the City on Anderson's ADA claim for a reasonable modification to keep Ellie at her house, we reverse the district court's judgment on that claim.

### 2. Intentional Discrimination

The plaintiffs contend that the City intentionally discriminated against Anderson and her daughter when it passed Ordinance 2013-1 in violation of Title II of the ADA. Title II provides

that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "[T]he phrase 'services, programs, or activities' encompasses virtually everything a public entity does." *Tucker v. Tennessee*, 539 F.3d 526, 532 (6th Cir. 2008). "We analyze claims of intentional discrimination brought pursuant to the ADA . . . under the familiar burden-shifting analysis established by [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)]." *Turner v. City of Englewood*, 195 F. App'x 346, 353 (6th Cir. 2006). "Under *McDonnell Douglas*, [a] [p]laintiff must first establish a prima facie case of discrimination." *Id.*

To establish a prima facie case of intentional discrimination under Title II of the ADA, a plaintiff must show that: (1) she has a disability; (2) she is otherwise qualified; and (3) she was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because[1] of her disability. *Tucker*, 539 F.3d at 532. In other words, the plaintiff must show that the defendant took action because of the plaintiff's disability, i.e., the "[p]laintiff must present evidence that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *Turner*, 195 F. App'x at 353; *see also Tucker*, 539 F.3d at 533 (holding that to make out a prima facie case of intentional discrimination under Title II of the ADA, a plaintiff must "establish[] that he or she was *intentionally* . . . subjected to discrimination . . . *because of* his or her disability") (emphasis original, internal quotation marks and brackets omitted); *Dillery v. City of Sandusky*, 398 F.3d 562, 568 (6th Cir. 2005) (rejecting a plaintiff's ADA claim for intentional discrimination because the plaintiff could not show that the defendants' actions were "because of her disability"). "Further, the plaintiff must show that the discrimination was *intentionally* directed toward him or her in particular." *Tucker*, 539 F.3d at 532 (emphasis original).

---

[1]Our test for intentional discrimination under Title II of the ADA previously required that the discrimination be "*solely*" because of the plaintiff's disability, *Tucker*, 539 F.3d at 535 (emphasis original); *see also Dillery v. City of Sandusky*, 398 F.3d 562, 567 (6th Cir. 2005), *Jones v. City of Monroe, Mich.*, 341 F.3d 474, 477 (6th Cir. 2003), but our decision in *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012) (en banc), rejected this sole-causation requirement. While *Lewis* dealt with intentional discrimination claims under Title I of the ADA, we specifically discussed the causation language in Title II, noting that it too "fails to use 'solely.'" *Id.* at 315. Therefore our holding in *Lewis* that "[t]he sole-cause standard . . . does not apply to claims under the ADA," *id.* at 317, applies with equal force where, as here, the intentional discrimination claim is brought under Title II.

Once a plaintiff establishes a prima facie case of discrimination, the defendant "must then offer a legitimate, nondiscriminatory reason for its" challenged action. *Sjostrand v. Ohio State Univ.*, 750 F.3d 596, 599 (6th Cir. 2014). "If [the defendant] does so—and its burden is merely one of production, not persuasion—[the plaintiff] must then present evidence allowing a jury to find that the [defendant's] explanation is a pretext for unlawful discrimination." *Id.*

Here, it is undisputed that C.A. is a qualified individual with a disability, but the parties dispute whether the plaintiffs can make out the third element of their prima facie case by showing that the City took action because of C.A.'s disability. The City maintains that its actions were motivated by the multiple citizen complaints against Anderson concerning unsanitary conditions at her house related to the presence of farm animals, and not by any discriminatory intent or animus against the disabled, while Anderson contends that the City was motivated to pass Ordinance 2013-1 because of C.A.'s disability. Therefore the issue here is whether the plaintiffs can make out a prima facie case of discrimination by showing that the City "*intentionally*" passed Ordinance 2013-1 "*because of* [C.A.'s] disability." *See Tucker*, 539 F.3d at 533 (internal quotation marks omitted).

Our decisions in *Dillery v. City of Sandusky*, 398 F.3d 562 (6th Cir. 2005) and *Hamm v. City of Gahanna, Ohio*, 109 F. App'x 744 (6th Cir. 2004), are instructive. In *Dillery*, a disabled plaintiff brought an intentional-discrimination claim under the ADA against police officers who allegedly stopped her because of her disability when she was using her wheelchair on the road. 398 F.3d at 568. We rejected that claim because we found that "the police did not stop [the plaintiff] because of her disability, but rather stopped her in response to citizen complaints about her being in the roadway." *Id.* In *Hamm*, the plaintiffs brought a claim under the ADA and the FHAA alleging that the city intentionally discriminated against them by refusing to re-zone the plaintiffs' property to allow the construction of group housing for the disabled. 109 F. App'x at 747. We rejected that claim because we found that the city denied the plaintiffs' re-zoning application due to opposition from the plaintiffs' neighbors, who were concerned with the proposed group-housing project's impact on the neighborhood and its property values. *See id.* at 747–49. In both *Dillery* and *Hamm*, we found that legitimate citizen complaints motivated the defendant city's actions. That the complaints were lodged against individuals with disabilities

did not transform the cities' responses to those complaints into intentional discrimination, because it was the complaints that motivated the cities' actions, not the fact that the plaintiffs had disabilities. So too here.

We find that the evidence, even when viewed in the light most favorable to Anderson, shows that it was citizens' complaints that motivated the City's actions, and that there is no evidence to support an inference of discriminatory intent. The City first ordered Anderson to remove another miniature horse from her property after receiving a complaint detailing unsanitary conditions caused by the animals there. After Anderson submitted a physician's letter explaining that C.A. was using the horse for therapy, the Blue Ash City Council decided not to enforce that order. It was only after Anderson acquired a second horse and the City received additional health complaints referring to the presence of "horses, goats, chickens and pigs living within [Anderson's] home and causing unsanitary conditions within" that the City ordered her to remove these farm animals, including the second horse. Throughout that administrative process, the City continued to permit Anderson to keep one miniature horse on her property for C.A. despite several of the complaints expressing doubts as to whether either horse was actually being used for therapeutic purposes. It was only after still more health complaints in the fall of 2012 that the City passed Ordinance 2013-1. Even then, the City included a provision that explicitly made an exception for animals protected by federal law. When Ordinance 2013-1 went into effect, the City did not cite Anderson for violating it, only issuing citations months later after Anderson brought the horse back to her house. This sequence of events is entirely consistent with the City responding to the legitimate concerns of its citizens about the sanitation problems posed by the presence of farm animals on residential property, and provides no basis for the inference that the City took action "because of [C.A.'s] disability." *See Tucker*, 539 F.3d at 533 (emphasis omitted); *Dillery*, 398 F.3d at 568.

On appeal, Anderson points to a number of events prior to the passage of Ordinance 2013-1 that she contends demonstrate the City's discriminatory intent, but none of these facts could support the inference that the City's actions were because C.A. is an individual with a disability. First, Anderson points to evidence that the City passed Ordinance 2013-1 because of her. It is true that the ordinance's preamble states that it was enacted in response to "many

complaints" and "inquiries from residents regarding the keeping of horses, pigs, goats, sheep, and alpacas" on residential property, and that Johnson conceded that Anderson's miniature horse was one motivation for Ordinance 2013-1. (Ordinance 2013-1, R. 2, PageID 49.) While this evidence is sufficient to show that the City may have passed the ordinance because of the plaintiffs, the issue here is whether the City passed the ordinance because C.A. is *disabled*. In *Dillery*, the city's police officers were clearly taking action because of the plaintiff when they arrested her for being in the roadway, but we rejected that claim because there was no evidence that their actions were "because of her disability." 398 F.3d at 568. Similarly, that the City responded to complaints about the condition of Anderson's residence does not mean that its response was affected by the fact that C.A. is an individual with a disability, so the fact that Ordinance 2013-1 may have been passed because of the plaintiffs is inapposite.

Anderson next contends that the Blue Ash City Council's actions during her administrative proceedings show the City's discriminatory intent. She points to the Council's decision in April 2012 ordering the removal of her second miniature horse, in which the Council examined whether either of Anderson's horses were service animals. Anderson suggests that, because only the second horse's removal was at issue, the fact that the Council discussed both horses is evidence of the City's discriminatory intent. But it was Anderson who raised the issue that both horses were service animals during that proceeding, so we can draw no inference about the City's motivations from the fact that the Council addressed Anderson's argument. She also points to the Council's decision in 2010 not to enforce the order for her to remove her first miniature horse as evidence that the City knew it would violate federal regulations to do so. Even if this was an acknowledgement by the City of its obligation to make reasonable accommodations under federal regulations, there is no suggestion that it impermissibly discriminated against the plaintiffs because of C.A.'s disability when additional health complaints spurred the City to question the continued reasonableness and necessity of her requested accommodation. Questioning the necessity and reasonability of a requested disability accommodation does not, by itself, create the inference of intentional discrimination. To hold otherwise would be to require public entities to grant any requested accommodation and never revisit an accommodation once granted lest they subject themselves to liability for intentional discrimination simply by questioning the reasonableness or necessity of the request.

Finally, Anderson contends that the City's procedures for assuring compliance with ADA regulations were inadequate, and that this was an indicator of the City's animus towards the disabled. This argument does not help Anderson make her prima facie case, which requires a plaintiff to show that the "discrimination was *intentionally* directed toward him or her in particular." *Tucker*, 539 F.3d at 532 (emphasis original). Even if the City's procedures for compliance with federal regulations had a negative impact on its disabled citizens generally, this does not support the inference that the City's actions were motivated by C.A.'s disability because "[a]cts and omissions which have a disparate impact on disabled persons in general are not specific acts of intentional discrimination against the plaintiff in particular." *Dillery*, 398 F.3d at 568 (internal quotation marks and brackets omitted).

Because the evidence viewed in the light most favorable to the plaintiffs does not support the inference that the City took action to compel Anderson to remove her miniature horse from her house because of C.A.'s disability, the plaintiffs have not established their prima facie case of intentional discrimination under Title II of the ADA. Therefore, we affirm the district court's grant of summary judgment to the City on the plaintiffs' ADA claim of intentional discrimination.

### D.     FHAA Claims

The FHAA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2). Such discrimination includes a "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" *Id.* at § 3604(f)(3)(B). "Plaintiffs who allege a violation of 42 U.S.C. § 3604(f) may proceed under any or all of three theories: disparate treatment, disparate impact, and failure to make reasonable accommodations." *Smith & Lee Assocs. v. City of Taylor, Mich.*, 102 F.3d 781, 790 (6th Cir. 1996).

Anderson invokes all three theories. First, she contends that by refusing to permit her to keep Ellie at her dwelling the City failed to make a reasonable accommodation for C.A.'s disability as required by the FHAA. Second, as to her disparate treatment claim under the

FHAA, Anderson repeats the assertion that she made under the ADA that the City intentionally discriminated against her because of C.A.'s disability. Third, Anderson alleges that, even if the City had no discriminatory animus, its actions have had a disparate impact on "C.A., and any disabled person within the City who may require the assistance of a miniature horse." (Appellant Br. 53.)

### 1.　　Reasonable Accommodation

The plaintiffs contend that the FHAA, like the ADA, requires the City to make a reasonable accommodation to allow Anderson to keep her miniature horse at her residence. The FHAA "creates an affirmative duty on [a] municipalit[y] . . . to afford its disabled citizens reasonable accommodations in its municipal zoning practices if necessary to afford such persons equal opportunity in the use and enjoyment of their property." *Howard v. City of Beavercreek*, 276 F.3d 802, 806 (6th Cir. 2002); *see* 42 U.S.C. § 3604(f). Unlike the ADA, the FHAA does not have minimum regulatory requirements for animals to qualify as a reasonable accommodation. *See* 28 C.F.R. § 35 app. A (discussing how the current ADA regulations define "service animal" to include a narrower class of animals than those protected under the FHAA). The "three operative elements" of the FHAA's reasonable accommodation requirement are "equal opportunity," "necessary," and "reasonable." *Smith & Lee Assocs.*, 102 F.3d at 794. On appeal, Anderson contends that there are disputed issues of fact as to each of these elements that preclude summary judgment for the City.

### a.　　Equal Opportunity and Necessity

The first two elements are closely related. The first asks "whether the requested accommodation would afford the disabled resident an equal opportunity to enjoy the property." *Hollis*, 760 F.3d at 541. The FHAA "links the term 'necessary' to the goal of equal opportunity. Plaintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice." *Smith & Lee Assocs.*, 102 F.3d at 795 (citations omitted). "The necessity element is, in other words, a causation inquiry that examines whether the requested accommodation or modification would redress injuries that otherwise would prevent a disabled resident from receiving the same enjoyment from the property as a non-disabled person would receive." *Hollis*, 760 F.3d at 541.

Equal use and enjoyment of a dwelling are achieved when an accommodation ameliorates the effects of the disability such that the disabled individual can use and enjoy his or her residence as a non-disabled person could. *See id.*; *see also Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277, 1288–89 (11th Cir. 2014) (finding that an emotional support dog was necessary for a plaintiff's equal use and enjoyment of his dwelling where it "alleviate[d] the effects of a disability" so that he could work from his house as a non-disabled person could, and that "without the dog, [the plaintiff's] social interactions would be so overwhelming that he would be unable to perform work of any kind" (internal quotation marks omitted)). Here the plaintiffs contend that C.A.'s horse allows her to play independently in her backyard as a non-disabled child can, and so having the horse at her house is necessary for her equal use and enjoyment of her dwelling.

The district court found that permitting Anderson to keep a horse at her house was unnecessary because C.A. could obtain therapy with a horse by traveling to a local farm or stable. On appeal, the City similarly argues that C.A. did not need therapy with a horse at her house, and that the accommodation was also unnecessary because "C.A. can ambulate and otherwise function without the horse," and continue to live in her house without it. (Appellee Br. 47–48.) Anderson contends that the accommodation was necessary for C.A. to play independently in her backyard as a non-disabled child could, and that therapy with a horse at a farm is no substitute for therapy at her house, citing to Dr. Levin's letter in which he stated that "[C.A.] fatigues easily, and just a drive across town to receive therapy can wipe her out leaving no energy to enjoy this therapeutic and recreational activity." (Levin Letter, November 3, 2010, R. 10-5, PageID 717.)

Regarding the assertion that C.A. can obtain therapy with a horse at a local farm or stable, Dr. Levin's letter is evidence from which a reasonable factfinder could find that C.A. cannot obtain the benefit of therapy after traveling from her house, so the district court's conclusion to the contrary on summary judgment, where it was required to draw all reasonable inferences in Anderson's favor, was in error. More to the point, the availability of an alternative treatment away from the plaintiff's dwelling is irrelevant to the FHAA, which requires reasonable accommodations necessary for a disabled individual to receive the "*same* enjoyment

from the property as a non-disabled person would receive," *Hollis*, 760 F.3d at 541 (emphasis added), not merely those accommodations that the disabled individual cannot function without or for which no alternative is available away from the dwelling. For the same reason, the City's argument that "C.A. can ambulate and otherwise function without the horse" is likewise irrelevant because the FHAA requires accommodations that are necessary to achieve housing equality, not just those accommodations that are absolutely necessary for the disabled individual's treatment or basic ability to function.

The City's argument that the accommodation was not necessary because C.A. can continue to live in her house without it is also inapposite. The City relies on our decision in *Howard*, in which we rejected a plaintiff's claim that a privacy fence was a necessary accommodation for him to continue to live in his dwelling in part because the plaintiff had lived there without the fence for years. *See* 276 F.3d at 806. The City points out that, like the plaintiff in *Howard*, C.A. can continue to live in her house without the presence of a horse. But, unlike the plaintiff in *Howard*, the plaintiffs here do not contend that the accommodation is necessary for C.A. to continue to reside in her dwelling, but rather that the accommodation is necessary for her to have an equal opportunity to enjoy a particular use of her house—independent recreation and exercise in her backyard. Because the FHAA requires accommodations that are necessary for the same enjoyment of a dwelling that a non-disabled person would receive, not just those that are necessary to remain in the dwelling at all, the City's reliance on *Howard* is misplaced. *See Bhogaita*, 765 F.3d at 1289 (finding that the FHAA required an accommodation for a puppy that was necessary for the plaintiff to work from his house, even though the plaintiff could continue to live in the house without it).

Anderson testified that Ellie allows C.A. to play independently and exercise in her backyard and that, without the horse, C.A. cannot do so for any significant length of time, and would effectively be denied the equal opportunity to play in her own backyard as non-disabled children can. This evidence, viewed in a light most favorable to the plaintiffs, is sufficient for a reasonable jury to find that the requested accommodation of keeping the miniature horse at her house is necessary for C.A.'s equal use and enjoyment of her dwelling.

b.       Reasonability

The "crux of a reasonable-accommodation . . . claim typically will be [the third 'operative element,'] the question of reasonableness." *Hollis*, 760 F.3d at 541.

> To determine the reasonableness of the requested modification, the burden that the requested modification would impose on the defendant (and perhaps on persons or interests whom the defendant represents) must be weighed against the benefits that would accrue to the plaintiff.  This is a highly fact-specific inquiry.  A modification should be deemed reasonable if it imposes no fundamental alteration in the nature of a program or undue financial and administrative burdens.

*Id.* at 541–42 (internal quotation marks and citations omitted).

The district court held that the accommodation was unreasonable, reiterating its finding that C.A. did not need therapy at her house because she could obtain it elsewhere, and also finding that permitting a horse in a residential neighborhood would "fundamentally alter the nature of the [City's] zoning scheme."  On appeal, the plaintiffs contend that there were disputed issues of fact as to the reasonability of their requested accommodation that precluded summary judgment to the City based on their evidence that C.A. would benefit from therapy with a horse at her house and that permitting the horse to live at Anderson's residence would not threaten public health or otherwise fundamentally alter the zoning scheme.  The City responds that Anderson's requested accommodation is unreasonable and would fundamentally alter its zoning scheme because the City's legitimate interests in the health, aesthetics, and property values of its residential neighborhoods are effectuated through enforcement of its zoning codes. The City further contends that these interests may be threatened by the presence of a horse on Anderson's property, pointing to the health complaints concerning Ellie, and that the City's interests must be balanced against the benefit that the accommodation would afford to C.A.

Factual disputes pervade the question of the accommodation's reasonableness and the "highly fact-specific" balancing of the City's interests against the plaintiffs' that it requires, precluding summary judgment for the City.  First, the City questions the extent to which C.A.'s benefit from therapy with a horse would be diminished if she obtains this therapy at a local farm or stable, but the letter from Dr. Levin creates a factual dispute over whether C.A. could benefit from such therapy after traveling from her house, and this dispute cannot be resolved on

summary judgment.    While the City's interests in public health, sanitation, and residential property values are clear, Anderson disputes the extent to which her requested accommodation would interfere with those interests, pointing to letters of support from her neighbors and the fact that she has secured a cleaning service to prevent the presence of a horse from creating unsanitary conditions at her house.    Similarly, while C.A. has a clear interest in having the assistance of a miniature horse at her house, the City disputes the extent of the inconvenience imposed on her by not having the horse in her backyard, pointing to the fact that C.A. can walk without the horse.

Likewise disputed is the City's contention that permitting the horse to remain at Anderson's house would fundamentally alter the nature of its zoning scheme.  While protecting public health and property values are central to the City's interests, Anderson has produced evidence that the presence of one miniature horse at her house will not create unsanitary conditions or devalue her neighbors' property, supported not only by her own testimony but by signed letters of support from her current neighbors.  She also testified that she has retained a service to clean up animal waste, and ensure that unsanitary conditions will not reappear.  As for the district court's assertion that, because Anderson lives in a residential area, "[a]llowing farm animals, such as miniature horses . . . in these areas fundamentally alters the zoning scheme," we have long since rejected the notion that making an exception to a zoning scheme to permit something that would normally be forbidden automatically amounts to a fundamental alteration. *See Smith & Lee Assocs.*, 102 F.3d at 796 ("We are not convinced that an additional three residents will fundamentally alter the nature of single-family neighborhoods.").   Requiring public entities to make exceptions to their rules and zoning policies is exactly what the FHAA does.  The fact that the City banned horses from residential property does not mean that any modification permitting a horse necessarily amounts to a fundamental alteration.

We conclude that there are genuine disputes of material fact as to whether Anderson's requested accommodation is reasonable and necessary to afford her and C.A. an equal opportunity to use and enjoy their dwelling, and so we reverse the district court's grant of summary judgment to the City on the plaintiffs' FHAA reasonable-accommodation claim.

### 2.    *Disparate Treatment*

"To prevail on a disparate treatment claim [brought under the FHAA], a plaintiff must show proof of intentional discrimination." *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 612 (6th Cir. 2012).  "Because a disparate-treatment claim requires the plaintiff to establish discriminatory animus, analysis of such a claim focuses on the defendant's intent." *Hollis*, 760 F.3d at 539.  As with intentional-discrimination claims under the ADA, "[t]his court therefore applies the three-step *McDonnell Douglas* test, which shifts the burden of production from the plaintiff to the defendant and then back to the plaintiff in an effort to zero in on the specific intent underlying the defendant's conduct." *Id.*  While the burden of production shifts, "[a]t all times the burden of persuasion rests with the plaintiff." *Id.* at 538.

As their FHAA disparate-treatment claim, the plaintiffs "incorporate [their] arguments made as to intentional discrimination" under the ADA.  (Appellant Br. 53.)  Likewise, for the same reasons we stated in our discussion of intentional discrimination under the ADA, we find no evidence that the City acted because C.A. is an individual with a disability, nor that the City otherwise harbored discriminatory animus against the disabled.  We therefore affirm the district court's grant of summary judgment to the City on the plaintiffs' FHAA disparate-treatment claim.

### 3.    *Disparate Impact*

Finally, the plaintiffs contend that the City violated the FHAA because its actions have had a disparate impact on C.A. and other disabled individuals who would benefit from the use of miniature horses at their houses.  "To show disparate impact [in violation of the FHAA], a plaintiff must demonstrate that a facially neutral policy or practice has the effect of discriminating against a protected class of which the plaintiff is a member." *HDC*, 675 F.3d at 613 (internal quotation marks and brackets omitted).  A "disparate-impact claim . . . turns not on the defendant's intent but instead on the broader effects of the disputed housing practice." *Hollis*, 760 F.3d at 539.  Plaintiffs alleging disparate-impact claims under the FHAA must first show that defendant's actions "caused handicapped individuals to suffer disproportionately more than other individuals." *HDC*, 675 F.3d at 613.

Anderson and the other plaintiffs contend that Ordinance 2013-1 had a disparate impact on C.A. and other disabled individuals who are unable to benefit from the use of miniature horses at their houses. But Anderson fails to recognize that this ordinance specifically exempts any animals protected by federal law, including the FHAA. Thus, by its own terms, Ordinance 2013-1 has *less* of an impact on disabled individuals who rely on the assistance of miniature horses or other animals than it does on the general population. We therefore affirm the district court's grant of summary judgment to the City on the plaintiffs' FHAA disparate-impact claim.

### III. CONCLUSION

Because the qualitative differences between the fact-finding procedures available to Anderson during her criminal trial in the Hamilton County Municipal Court and those available to her as a civil plaintiff militate against giving that criminal judgment preclusive effect here, we conclude that the district court erred in determining that res judicata bars this lawsuit. We affirm the district court's grant of summary judgment to the City on the plaintiffs' intentional-discrimination ADA claim and disparate-treatment and disparate-impact FHAA claims. We reverse the district court's grant of summary judgment to the City in all other respects, and remand for further proceedings consistent with this opinion.