******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

COMMISSION ON HUMAN RIGHTS &
OPPORTUNITIES EX REL. WENDY
PIZZOFERRATO ET AL. *v.* THE
MANSIONS, LLC, ET AL.
(AC 46774)

Bright, C. J., and Alvord and Keller, Js.

*Syllabus*

The defendants appealed from the trial court's judgment for the plaintiff commission and the intervening individual plaintiffs, W and R, finding that the defendants violated the state fair housing laws (§ 46a-64b et seq.) by constructively denying the individual plaintiffs' request for an accommodation of the defendants' no pets policy for W's two emotional support dogs. The defendants claimed, inter alia, that the court improperly determined that two emotional support dogs were necessary for W's equal use and enjoyment of the dwelling. *Held*:

The defendants' claim that the trial court improperly concluded that W suffered from a disability that required an accommodation when the court found only that the defendants regarded her as being disabled was without merit because the court also found that the plaintiffs satisfied their burden of proving that W had a "record of" having a mental disability within the meaning of the statute (§ 46a-51 (20)).

The trial court improperly concluded that the plaintiffs met their burden of showing that two emotional support dogs were necessary for W's equal use and enjoyment of the dwelling, as the evidence submitted by the plaintiffs, viewed in the light most favorable to the plaintiffs, was insufficient as a matter of law to prove that both dogs were necessary to ameliorate the effects of W's mental disability.

Argued September 10, 2024—officially released March 4, 2025

*Procedural History*

Action to recover damages for, inter alia, alleged housing discrimination, and for other relief, brought to the Superior Court in the judicial district of Tolland, where the court, *Gordon, J.*, granted the motion to intervene filed by Wendy Pizzoferrato et al.; thereafter, the case was tried to the court, *Huddleston, J.*; judgment for the plaintiffs, from which the defendants appealed to this court. *Reversed*; *judgment directed*.

*Richard M. Hunt*, pro hac vice, with whom, on the brief, was *Maria K. Tougas*, for the appellants (defendants).

*Libby Reinish*, human rights attorney, with whom was *Michelle Dumas Keuler*, for the appellee (named plaintiff).

*Robert F. Kappes*, for the appellees (intervening plaintiffs).

*Opinion*

BRIGHT, C. J. In this housing discrimination action, the defendants, The Mansions, LLC (Mansions), 75 Hockanum, Inc., and Candace Barnard,[1] appeal from the judgment of the trial court, rendered after a court trial, in favor of the plaintiff, the Commission on Human Rights and Opportunities (commission), and the intervening plaintiffs, Wendy Pizzoferrato (Wendy) and Rudy Pizzoferrato (Rudy).[2] The court found that the defendants violated the state fair housing laws, General Statutes § 46a-64b et seq., by constructively denying the Pizzoferratos' request for an accommodation of the defendants' "no pets" policy for Wendy's two emotional support dogs. On appeal, the defendants claim that the court improperly concluded that (1) Wendy needed her emotional support dogs to ameliorate the effects of a disability when the court found only that the defendants regarded her as being disabled and not that she actually was disabled, (2) two emotional support dogs were necessary for Wendy's equal use and enjoyment of the dwelling, and (3) the defendants constructively denied the Pizzoferratos' request for an accommodation. We

_____

[1] Mansions is the owner of an apartment complex in Vernon, 75 Hockanum, Inc., is the managing entity for Mansions, and Barnard is the director of operations for Mansions.

[2] The Pizzoferratos filed a notice with this court adopting the appellate brief filed by the commission. For ease of discussion, we refer to the commission and the Pizzoferratos collectively as the plaintiffs.

agree with the defendants' second claim and, therefore, reverse the judgment of the trial court.[3]

The following facts, as found by the court, and procedural history are relevant to our analysis of the defendants' claims. "In 2017, the Pizzoferratos sold [their house] and moved into an apartment complex known as Vintage at the Grove (Vintage). At the time, they had two pet Shih Tzu dogs. Vintage was 'pet friendly' but charged a monthly fee for the two dogs. [Wendy] became friends with a manager at Vintage, who told her that the pet fees would be waived if the dogs were emotional support animals. The manager also gave her the name of a therapist, who in turn recommended Maurice LaPointe, a licensed marital and family therapist. [Wendy] contacted [LaPointe] and met with him. [LaPointe] subsequently provided a certification for Vintage that [Wendy] 'suffers from moderate anxiety and that her two canines provide relief.' Vintage accepted [LaPointe's] certification and stopped charging the pet fees. . . .

"In 2019, [the Pizzoferratos] began to look for a less expensive apartment. They first visited Mansions' rental office in May, 2019. Victoria Dumeng and Amanda Proto greeted them. Dumeng, who introduced herself as a Mansions employee, said she would answer all their questions. . . . The Pizzoferratos were impressed by the complex, although the apartment was not quite what they wanted. Before paying a $200 application fee, they asked whether their two dogs would be a problem. [Dumeng] answered that 'all you need is a note from your doctor.' The Pizzoferratos completed a rental application on May 25, 2019, in which they identified

---

[3] Because we conclude that the defendants are entitled to judgment in their favor due to the plaintiffs' failure to establish that the requested accommodation was necessary for Wendy's equal use and enjoyment of the dwelling, we do not consider whether the court properly found that the defendants constructively denied the Pizzoferratos' request.

their two dogs as 'assistance animals.' They did not obtain an apartment at Mansions at that time.

"In October, 2019, they again visited Mansions for a tour of a townhouse unit. They again went to Mansions' rental office, where [Dumeng] and [Proto] worked. Before touring the townhouse, [Wendy] again asked [Dumeng] if her two support animals would be a problem in light of Mansions' no pet policy. [Dumeng] said that all she would need was a note from her doctor. They toured the townhouse unit, which met their needs and suited their preferences. . . . They submitted online rental applications on October 22, 2019, which were accepted by [Dumeng] and processed by [Proto]. The online application form contained a section . . . for identifying two pets and boxes to check regarding 'assistance animal status.' [Rudy's] application indicated that they had two dogs. His application stated the names, ages, breed, and weights of the two dogs and checked the 'yes' box on the line for 'assistance animal status.'

"On October 22, 2019, the same day that they submitted the Mansions rental application, and before that application was approved by Mansions, the Pizzoferratos gave notice to Vintage that they would be vacating their Vintage apartment by December 22, 2019. . . . On October 23, 2019, [Wendy] obtained Mansions' 'Request for Accommodation' form and provided it to [LaPointe], who completed it for her. The form was preprinted with seven paragraphs, each of which had blanks for the responding provider to fill in.[4] . . . LaPointe wrote '[Wendy]' [for] the patient's name,

---

[4] "The preprinted paragraph 7 provided as follows:

" 'For requests related to emotional support or therapy animals only: _____'s (name of patient) animal, a _____ (species and breed), provides emotional support that alleviates the listed symptoms of _____'s (name of patient) mental impairment. (List the symptoms): _____.' "

'shitzu' after 'a' and before '(species and breed),' and 'panic attacks' . . . for symptoms.

"[Wendy] submitted the completed form to Mansions on October 24, 2019. [Dumeng] forwarded the accommodation request to Richard Hunt, a Texas attorney whose practice focuses on the federal Fair Housing Act [(FHA), 42 U.S.C. § 3601 et seq. (2024)] and who advises Mansions on fair housing issues. According to an entry dated October 24, 2019, in an activity log maintained by Mansions, [Dumeng] noted that 'Richard approved the request.' By email sent on October 25, 2019, [Proto] informed the Pizzoferratos that their rental application had been accepted and told them how to access and sign their lease electronically. The Pizzoferratos signed and submitted the lease documents the same day. By email [sent] on October 26, 2019, [Dumeng] advised [Wendy] that her accommodation request had been approved. Attached to [that] email were an 'Animal Addendum' and a 'Support or Service Animal Amendment to Animal Addendum' for the Pizzoferratos to complete. [Rudy] returned the completed forms to Mansions. The completed forms identified the same two dogs that the Pizzoferratos had identified on their rental application.

"It was at that point that problems arose. Although both the rental application and the animal addendum had spaces for identifying two animals, and the Pizzoferratos had clearly identified their two dogs on both of those forms, the accommodation request form had only one space. Observing that the Pizzoferratos' animal addendum listed two dogs, [Dumeng] sought advice from [Hunt]. He advised her to notify [Wendy] 'that the original request was for one dog and that we would be able to accept the one dog as an exception to our no-pet policy, however, not the second one.' [Dumeng] accordingly sent an email to [Wendy] on November 1, 2019, that stated in relevant part: 'We approved your

request for accommodation based on information from your therapist indicating you needed one dog as an emotion[al] support animal to mitigate the symptoms of your anxiety. There was no indication that you needed two dogs. We will permit the one emotional support dog as an exception to our no pets policy, but not the other.'

"Before [Wendy] read that email, she appeared at Mansions' office to provide copies of the dogs' vaccination records and dog licenses for the town of Vernon, which she had obtained at Mansions' request. According to [Dumeng's] note in Mansions' activity log, [Wendy] was 'made aware of the email and that proof for the need of the second dog was necessary in order to approve [its] residency on the property. She had her husband Rudy email over the form that they had supplied to their previous residence.' The form that [LaPointe] had provided to Vintage, and that the Pizzoferratos now provided to Mansions, stated that [Wendy] 'suffers from moderate anxiety and that her two canines provide relief.' [Wendy] testified that [Dumeng] told her 'that should be fine.' However, [Dumeng] forwarded the Vintage accommodation form to [Hunt] 'to review and advise.'

"According to Mansions' activity log, on November 6, 2019, [Hunt] advised that 'we have a few different ways to go about this, depending on if we wanted to lose the resident or possibly incur a complaint.' . . . Dumeng passed the issue to [Barnard] to proceed.

"[Barnard], Mansions' director of operations, testified that 'final authority to grant or deny housing accommodation requests' rested with her. She had been away from the office when the Pizzoferratos submitted their rental application, accommodation request, and other documents. On November 6, 2019, she learned of the issue regarding the Pizzoferratos' second dog. On the

same day, she sent an email to [Wendy], advising her that Mansions needed additional information to consider the second dog because the document provided by [LaPointe] 'does not constitute reliable evidence of a disability related need for a second emotional support dog.' She further stated that to consider the second dog, Mansions would need to have [LaPointe] provide the following:

" 'An explanation, on [his] letterhead, of why your anxiety requires not one, but two emotional support animals, along with a reference to scientific studies or papers justifying the conclusion that two animals will better control your anxiety than one.'

" 'An explanation of why [his] original document mentioned only a single emotional support animal.'

" 'A statement based on [his] sessions with you of how frequently your anxiety is so acute you cannot leave your apartment.'

"In addition, [Barnard's] email stated, 'we need to know whether you take one or both of your dogs with you to work on a daily basis.' She concluded that '[o]nce you provide this additional information we will evaluate your request for accommodation with respect to a second dog.'

"[Wendy] was very upset by this email. She believed that Mansions was requesting her therapist's treatment notes, which she regarded as private; she did not believe there were scientific papers of the sort requested by [Barnard]; and she thought the email indicated that Mansions did not want the Pizzoferratos as tenants. [Rudy] was also upset. He said 'it was clear they didn't want us here.' The Pizzoferratos had already given notice that they were terminating their lease at Vintage, effective as of December 22, 2019, which gave them only a few weeks to find alternative housing. [Rudy]

was concerned that if they provided additional information to fulfill Mansions' 'impossible demands,' 'they would just come up with more because . . . they didn't want us there.' They concluded that they needed to find another place to live as quickly as possible.

"On November 8, 2019, [Wendy] emailed a lengthy emotional response to [Barnard], describing [Barnard's] actions as 'vile and evil' and violative of fair housing laws and health privacy laws. She requested a refund of all money that the Pizzoferratos had paid to Mansions. Mansions' activity log indicates that as of November 12, 2019, the lease was canceled. The Pizzoferratos admitted that Mansions refunded all money that the Pizzoferratos had paid it.

"The Pizzoferratos did locate alternative housing. They considered it to be inferior to Mansions because it was smaller, more dated, and lacked the amenities that had drawn them to Mansions. They moved into a rental unit . . . for approximately [one] year before buying a new residence." (Citation omitted; footnote added; footnotes omitted.)

The Pizzoferratos filed a discriminatory practice complaint with the commission pursuant to General Statutes § 46a-82. After an initial investigation, the commission found that there was reasonable cause to believe that a discriminatory practice had been committed, and both the Pizzoferratos and the defendants elected a civil action in lieu of an administrative hearing pursuant to General Statutes § 46a-83 (g) (2). The commission thereafter filed the underlying action against the defendants, alleging that the defendants discriminated against the Pizzoferratos on the basis of Wendy's disability by, among other things, denying their request for a reasonable accommodation in violation of General Statutes § 46a-64c. The plaintiffs asserted that Wendy has a mental disability within the meaning of General

Statutes § 46a-51 (20), which provides that " '[m]ental disability' refers to an individual who has a record of, or is regarded as having one or more mental disorders, as defined in the most recent edition of the American Psychiatric Association's 'Diagnostic and Statistical Manual of Mental Disorders [(DSM)]' . . . ."

The case proceeded to a court trial, which spanned two days in October, 2022. Wendy, Rudy, LaPointe, and Barnard all testified at trial, and the defendants also presented videos of the depositions of two psychologists, Cassandra Boness and Dennis Perez, who testified as experts for the defendants. At the conclusion of the plaintiffs' case-in-chief, the defendants moved for a judgment of dismissal pursuant to Practice Book § 15-8 for failure to make out a prima facie case. The defendants' counsel argued that the plaintiffs failed to present sufficient evidence to establish that Wendy had a disability and that the defendants constructively denied her request for a reasonable accommodation. More specifically, the defendants' counsel argued that LaPointe's testimony was not credible because he failed to testify regarding the specific diagnostic criteria he applied in diagnosing Wendy and that nothing written in Barnard's November 6 email could be construed as a denial of Wendy's requested accommodation.

In response, both the commission's counsel and counsel for the Pizzoferratos argued that, because Wendy requested an accommodation, which the defendants initially granted on the basis of the information Wendy provided to them about her disability, there was sufficient evidence that she is disabled within the meaning of § 46a-51 (20). They further argued that Barnard's November 6 email requesting, among other things, scientific studies demonstrating the need for two support animals was a constructive denial of Wendy's request because the defendants asked for studies that their own experts asserted do not exist. The court, *Huddleston*,

*J.*, reserved judgment on the motion, and the defendants presented their case-in-chief, which included testimony from Barnard and videos of the depositions of Boness and Perez.

In their posttrial briefs, the plaintiffs argued that the testimony of both Wendy and LaPointe established that she has a record of having generalized anxiety disorder, a recognized diagnosis under the DSM, and that the defendants' granting of the accommodation request for one dog established that Wendy was "regarded as" having a disability. The defendants, however, argued that the plaintiffs "presented no credible evidence at trial that [Wendy] had a disability, that she needed the accommodation, or that the accommodation was refused." As to LaPointe's testimony, the defendants argued that given "the discrepancy between his treatment notes and [both] the diagnostic criteria for generalized anxiety disorder and [Perez'] expert testimony, the [plaintiffs] failed to provide evidence making it more probable than not that [Wendy] suffered from a mental disorder diagnosed in the DSM. Thus, they failed to prove she had a 'mental disability' as defined in . . . § 46a-51 (20)."

On July 28, 2023, the court issued a memorandum of decision, rendering judgment for the plaintiffs. The court concluded that the definition of "mental disability" in § 46a-51 (20) applies to state fair housing claims[5] and that the plaintiffs had established that Wendy has a mental disability within the meaning of the statute.

---

[5] On appeal, the defendants claim that the court improperly concluded that § 46a-51 (20) applies to fair housing claims. In their posttrial brief in the trial court, however, the defendants argued that Wendy "was required to prove her disability as a 'handicap' under the [FHA] or to rely on the 'includes, but is not limited to' language in § 46a-64b (8) to find some other definition of a mental disability under Connecticut law. That alternative definition is found in . . . § 46a-51 (20) . . . ." After the parties filed their posttrial briefs, during oral argument before the trial court, the defendants' counsel again argued that "[t]here are two definitions of disability. One is the Connecticut definition of a mental disability or mental impairment. The other is the [FHA] . . . ."

"[A] party cannot take a path at trial and change tactics on appeal. . . . [T]he term induced error, or invited error, has been defined as [a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the [alleged] erroneous ruling. . . . It is well established that a party who induces an error cannot be heard to later complain about that error. . . . This principle bars appellate review of induced nonconstitutional error and induced constitutional error. . . . The invited error doctrine rests [on principles] of fairness, both to the trial court and to the opposing party." (Citation omitted; internal quotation marks omitted.) *Gladstein* v. *Goldfield*, 163 Conn. App. 579, 585, 137 A.3d 60 (2016), appeal dismissed, 325 Conn. 418, 159 A.3d 661 (2017).

The record demonstrates that the plaintiffs expressly relied on the definition of mental disability in § 46a-51 (20) and that the defendants argued that the plaintiffs had failed to establish that Wendy satisfied either prong of that definition. On appeal, however, the defendants attempt to pursue a different claim, arguing that, "[d]espite the 'includes, but is not limited to' language, the legislature's deliberate exclusion of the definition of 'mental disability' while explicitly including the definition of 'physical disability' clearly indicates an intent that the definition of 'mental disability' in [§] 46a-51 (20) does not apply to the phrase 'physical or mental disability' used in [§] 46a-64b." They rely on "the doctrine of expressio unius est exclusio alterius—the expression of one thing is the exclusion of another—[under which] we presume that when the legislature expresses items as part of a group or series, an item that was not included was deliberately excluded." (Internal quotation marks omitted.) *Mayer* v. *Historic District Commission*, 325 Conn. 765, 776, 160 A.3d 333 (2017).

We question the application of the defendants' proffered canon of statutory construction given that § 46a-64b (8) expressly provides that the definitions of physical and mental disability are "not limited to" the expressed items in the series that follows. See *Woodbridge Newton Neighborhood Environmental Trust* v. *Connecticut Siting Council*, 349 Conn. 619, 637–38, 321 A.3d 363 (2024) ("The statute makes clear . . . that the list is not exclusive, because it provides that significant adverse effects 'includ[e], but [are] not limited to,' the expressly listed factors. . . . Accordingly, the legislature has not ruled out the possibility that there may be unenumerated, significant adverse effects that must be considered . . . ." (Citation omitted.)). Nevertheless, because the defendants not only failed to raise this claim before the trial court but also invited the court to apply § 46a-51 (20), we decline to review it. See *Gladstein* v. *Goldfield*, supra, 163 Conn. App. 584–85 (declining to review plaintiff's unpreserved claim that "definition of mistake, as advanced by all parties at trial and embraced by the trial court, was incorrect" because "she induced the action of the court from which she now complains"); see also *Healey* v. *Haymond Law Firm, P.C.*, 174 Conn. App. 230, 241 n.6, 166 A.3d 10 (2017) ("It may be misleading, however, to refer to this doctrine simply as 'induced error.' . . . Given that the doctrine implicates only a claim's reviewability, our jurisprudence is clear that the doctrine does not require us to address the merits of the claim." (Emphasis omitted.)); *Gladstein* v. *Goldfield*, supra, 585 n.3 ("[b]ecause we conclude that the plaintiff's claim is not reviewable, we need not determine whether the court's

The court first reasoned that, "[i]n approving the accommodation request, [the defendants] treated [Wendy] as having a mental disability and as having established that an emotional support animal would alleviate at least one or more symptoms of her disability. [Therefore] [t]he plaintiffs met their burden of proving that [Wendy] was 'regarded as' having a disability and thus was disabled within the terms of both § 46a-64b (8) . . . and § 46a-51 (20)."

The court then rejected the defendants' contentions that LaPointe, as a licensed marriage and family therapist, is unqualified to provide a DSM diagnosis and that there was insufficient factual support for LaPointe's diagnosis of generalized anxiety disorder. The court reasoned that "[t]he claim that a licensed marital and family therapist is categorically unqualified by training and experience to make a DSM diagnosis is inconsistent with General Statutes § 20-195a (3), which defines the scope of practice for licensed marital and family therapists.[6] . . . Although marital and family therapists work 'within the context of marriage and family systems,' they are authorized by law to make diagnoses within that framework. . . .

"LaPointe testified credibly that he had completed three years in a master's degree program in marriage and family counseling, had a thousand client contact hours before taking the licensure examination, and had several internships before being licensed in 2002 as a marriage and family therapist. Since then, he has taken

interpretation of the term 'mistake' in [General Statutes] § 52-109 was proper").

[6] General Statutes § 20-195a (3) provides: " 'Marital and family therapy' means the evaluation, assessment, *diagnosis*, counseling, management and treatment of emotional disorders, whether cognitive, affective or behavioral, within the context of marriage and family systems, through the professional application of individual psychotherapeutic and family-systems theories and techniques in the delivery of services to individuals, couples and families . . . ." (Emphasis added.)

continuing education courses, attended workshops, and read literature to keep current in his field. Under § 7-2 of the Connecticut Code of Evidence, he was qualified by education and experience to testify as an expert within his field, including the diagnosis of 'emotional disorders, whether cognitive, affective, or behavioral' in the context of marriage and family systems." (Footnote added.)

As to whether LaPointe correctly diagnosed Wendy with generalized anxiety disorder, the court reasoned that "Perez testified as to the shortcomings in [LaPointe's] diagnosis, stating that the record did not contain sufficient information about the frequency, duration, and severity of [Wendy's] anxiety and that [LaPointe] lacked information with respect to certain of the DSM criteria for a generalized anxiety disorder diagnosis. If, as the defendants contend, the definition of 'mental disability' in § 46a-51 (20) required a plaintiff to prove that he or she *has been accurately diagnosed with* one or more mental disorders as defined in the DSM, the court would be inclined to agree that the plaintiffs' proof was insufficient. [LaPointe] did not apply the DSM criteria with mathematical precision. . . . Nevertheless, he did document symptoms she reported that are consistent with generalized anxiety disorder, including excessive worry, difficulty concentrating, difficulties sleeping, and body aches. Based on his observations of [Wendy], he testified: 'I believe [Wendy] is an anxious person, and has been an anxious person for a long time, and that encounters . . . with her son . . . would activate anxious symptoms which she suffers from.' He stood by his diagnosis of generalized anxiety disorder. Whether . . . he properly applied all the DSM criteria, the court is persuaded that he made his diagnosis in good faith based on his personal observations of [Wendy] in therapy sessions.

"Contrary to the defendants' claims, the accuracy of [LaPointe's] DSM diagnosis is not the dispositive issue. As previously discussed, the definition of 'mental disability' in § 46a-51 (20) is not limited to persons who *have* a mental disorder as defined by the DSM, but includes any individual '*who has a record of*, or is regarded as having one or more mental disorders,' as defined in the DSM. Because the defendants treated [Wendy] as having a disability when they granted her accommodation request, the plaintiffs have proved that [Wendy] was a person with a mental disability within the meaning of § 46a-51 (20)." (Emphasis in original; footnotes omitted.)

The court then concluded that having two dogs rather than one was "necessary" for Wendy's equal enjoyment of the apartment within the meaning of § 46a-64c (a) (6) (B) (ii) because Wendy "testified that she relied on the two dogs for different types of comfort and support when she had panic attacks." Finally, the court concluded that the defendants constructively denied the request for accommodation when they requested additional documentation, which the plaintiffs "reasonably construed . . . as indicating that Mansions did not want them there." Accordingly, the trial court rendered judgment for the plaintiffs. The court imposed a $3300 civil penalty against each defendant and awarded Wendy $7500 and Rudy $5000 in damages for emotional distress. This appeal followed.

"In order to prove a failure-to-accommodate claim, a plaintiff must show (1) that the plaintiff or a person who would live with the plaintiff had a [disability] within the meaning of § [46a-64c]; (2) that the defendant knew or reasonably should have been expected to know of the [disability]; (3) that the accommodation [may be] necessary to afford the [disabled] person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation requested was reasonable; and (5) that

the defendant refused to make the requested accommodation." *Olsen* v. *Stark Homes, Inc.*, 759 F.3d 140, 156 (2d Cir. 2014).[7] On appeal, the defendants claim that the plaintiffs failed to establish two of these necessary elements—namely, that Wendy has a disability within the meaning of the state fair housing laws and that the requested accommodation for two emotional support dogs was necessary to afford her an equal opportunity to use and enjoy the dwelling. We address each claim in turn.

I

The defendants claim that the court improperly concluded that Wendy suffered from a disability that required an accommodation when the court found only that the defendants regarded her as being disabled. They argue that "[o]nce the trial court found that [Wendy] did not suffer from any real disability or handicap, a finding that her requested accommodation was necessary for her equal use and enjoyment of the apartment because of her disability became impossible. A

---

[7] "[W]hen the overlap between state and federal law is deliberate, as in this case, federal decisions are particularly persuasive." *Commission on Human Rights & Opportunities* v. *Savin Rock Condominium Assn., Inc.*, 273 Conn. 373, 386, 870 A.2d 457 (2005). Thus, in addressing claims brought under "our state fair housing laws, we are guided by the cases interpreting federal fair housing laws . . . despite differences between the state and federal statutes." (Internal quotation marks omitted.) *Lopez* v. *William Raveis Real Estate, Inc.*, 343 Conn. 31, 43, 272 A.3d 150 (2022); see also *Webster Bank* v. *Oakley*, 265 Conn. 539, 568, 830 A.2d 139 (2003) ("[i]t is well established that in addressing claims brought under both federal and state housing laws, we are guided by the cases interpreting federal fair housing laws . . . despite differences between the state and federal statutes" (internal quotation marks omitted)), cert. denied, 541 U.S. 903, 124 S. Ct. 1603, 158 L. Ed. 2d 244 (2004). Nevertheless, it is also well settled that "federal law defines the beginning and not the end of our approach to the subject. . . . [Thus], we have interpreted our statutes even more broadly than their federal counterparts, to provide greater protections to our citizens, especially in the area of civil rights." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Savin Rock Condominium Assn., Inc.*, supra, 386 n.11.

disability that arises from a mistaken belief by the landlord cannot give rise to a need for an accommodation." The plaintiffs respond that the court found that Wendy satisfied both prongs of the definition of "mental disability" under § 46a-51 (20) because it "found that [Wendy] had a record of [generalized anxiety disorder], a mental disorder in the DSM," and "that the [defendants] regarded [Wendy] as having this disorder. . . . But either finding, standing alone, is sufficient to hold that [Wendy] is a person with a mental disability." (Citation omitted; footnote omitted.) We conclude that the defendants' claim is without merit because the court found that the plaintiffs satisfied their burden of proving that Wendy has a "record of" having a mental disability within the meaning of § 46a-51 (20).[8]

Our resolution of the defendants' claim requires that we construe the court's judgment and the relevant statutes. Accordingly, our review is plenary. See *Rader* v. *Valeri*, 223 Conn. App. 243, 257, 308 A.3d 66 (construction of court's judgment is question of law subject to plenary review), cert. denied, 348 Conn. 959, 312 A.3d 37 (2024); see also *Lopez* v. *William Raveis Real Estate, Inc.*, 343 Conn. 31, 41–42, 272 A.3d 150 (2022) (statutory construction raises question of law subject to plenary review). "It is well settled that we follow the plain meaning rule pursuant to General Statutes § 1-2z in construing statutes to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *Lopez* v. *William Raveis Real Estate, Inc.*, supra, 42.

Pursuant to § 46a-64b (8), " '[p]hysical or mental disability' includes, but is not limited to, intellectual disability, as defined in section 1-1g, and physical disability, as defined in subdivision (15) of section 46a-51, and

---

[8] Our conclusion as to the "record of" prong, discussed further in this opinion, renders moot the defendants' claim that the court improperly found that the defendants regarded Wendy as being disabled.

also includes, but is not limited to, persons who have a handicap as that term is defined in the [FHA]." The FHA[9] defines "Handicap" as "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment . . . ." 42 U.S.C. § 3602 (h) (2024). "The first definition is often referred to as the 'actual disability' prong, and the [second and] third as the [record of and] 'regarded as' prong[s]." *SoCal Recovery, LLC* v. *Costa Mesa*, 56 F.4th 802, 812–13 (9th Cir.), cert. denied, U.S. , 144 S. Ct. 422, 217 L. Ed. 2d 234 (2023). "Though the FHA uses the word 'handicap' instead of 'disability,' 'handicap' is defined using the same three alternative definitional prongs as 'disability' under the [Americans with Disabilities Act (ADA)]. Thus, the words 'handicap' and 'disability' are construed to have the same meaning."[10] Id., 811; see also 42 U.S.C. § 12102 (1) (2024).

---

[9] "The Fair Housing Amendments Act of 1988 amended the [FHA] to bar housing discrimination against the handicapped. Pub. L. No. 100-430, § 6, 102 Stat. 1619, 1620–22 (adding 42 U.S.C. § 3604 (f))." *Davis* v. *Echo Valley Condominium Assn.*, 945 F.3d 483, 489 (6th Cir. 2019), cert. denied, U.S. , 141 S. Ct. 162, 207 L. Ed. 2d 1099 (2020).

[10] "Until 2008, the ADA definition of 'disability' was virtually identical to the FHA definition of 'handicap,' and so the [c]ourt's interpretation of the ADA was frequently applied to the FHA." *Rodriguez* v. *Village Green Realty, Inc.*, 788 F.3d 31, 40 n.10 (2d Cir. 2015). "The definition of 'disability' under the ADA was previously interpreted narrowly. . . . In 2008, however, Congress passed the ADA Amendments Act (the 'ADAAA') . . . which broadened the definition of 'disability' under the ADA. . . . '[T]he principal purpose of the ADAAA was to overrule the [United States] Supreme Court's arguably narrow interpretation of what constitutes an ADA-qualifying disability . . . and to make clear that the substantial-limitation requirement in the definition of "disability" is not an exacting one.' " (Citations omitted.) *Hamilton* v. *Westchester County*, 3 F.4th 86, 92 (2d Cir. 2021). "The FHA, however, was not similarly amended and so our FHA interpretation is still guided by pre-ADAAA cases." *Rodriguez* v. *Village Green Realty, Inc.*, supra, 40 n.10.

We note that, because § 46a-51 (20) does not include the federal definition's substantial limitation requirement, the distinction between cases decided before and after the ADAAA has no bearing on our analysis in the present case.

Accordingly, under federal law "[i]t is insufficient for individuals attempting to prove disability status under this [definition] to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those claiming [to be disabled] . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." (Internal quotation marks omitted.) *Anderson* v. *Discovery Communications, LLC*, 517 Fed. Appx. 190, 195 (4th Cir. 2013), cert. denied, 571 U.S. 1164, 134 S. Ct. 1009, 187 L. Ed. 2d 851 (2014).[11]

The plaintiffs, however, alleged that Wendy was disabled within the meaning of § 46a-51 (20), which provides that " '[m]ental disability' refers to an individual who has a record of, or is regarded as having one or more mental disorders, as defined in the most recent edition of the" DSM.[12] Thus, unlike the FHA, which requires that a plaintiff prove that her mental impairment "substantially limits one or more . . . major life activities"; 42 U.S.C. § 3602 (h) (2024); § 46a-51 (20) requires no functional limitation. See A. Long, "State Anti-Discrimination Law as a Model for Amending the Americans with Disabilities Act," 65 U. Pitt. L. Rev. 597, 642 (2004) ("[b]ecause Connecticut's definition simply refers a court to an established list of mental conditions, a plaintiff alleging the existence of a mental disability

[11] In *Anderson* v. *Discovery Communications, LLC*, supra, 517 Fed. Appx. 190, the court explained that the ADAAA amendments did not apply to that case "because [the plaintiff] was terminated prior to their enactment." Id., 195 n.7; see footnote 10 of this opinion.

[12] Section 46a-64b, which sets forth definitions applicable to discriminatory housing practices, makes clear in subsection (8) that mental disability "includes, *but is not limited to*, intellectual disability, as defined in section 1-1g . . . and also includes, *but is not limited to*, persons who have a handicap as that term is defined in the [FHA]." (Emphasis added.) In addition, § 46a-51 expressly provides that the definitions set forth therein apply to "this chapter," which necessarily includes § 46a-64b.

is relieved of the task of demonstrating any functional limitation"). Another distinguishing feature of § 46a-51 (20) is that it does not include an "actual disability" prong; rather, it provides only the two alternative definitional prongs—"record of" or "regarded as."

Before the trial court, the plaintiffs presented evidence as to both prongs of § 46a-51 (20), through the testimony of Wendy and LaPointe regarding Wendy's diagnosis of generalized anxiety disorder, which is a mental disorder defined in the DSM. Although the defendants claim that the court found that the plaintiffs had satisfied only the "regarded as" definitional prong under § 46a-51 (20), it is evident from the court's analysis that it found that the plaintiffs had satisfied their burden as to the "record of" prong as well.

In construing the court's judgment, we are mindful that "judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . [A] trial court opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding." (Citation omitted; internal quotation marks omitted.) *Alpha Beta Capital Partners*, *L.P.* v. *Pursuit Investment Management*, *LLC*, 193 Conn. App. 381, 428, 219 A.3d 801 (2019), cert. denied, 334 Conn. 911, 221 A.3d 446 (2020), and cert. denied, 334 Conn. 911, 221 A.3d 446 (2020).

In finding that Wendy was disabled within the meaning of our state fair housing laws, the court concluded that LaPointe's diagnosis of generalized anxiety disorder, although incomplete in some respects, constituted a record of Wendy having a mental disorder defined in the most recent edition of the DSM. To be sure, the court found that LaPointe's notes and testimony did

not establish that he meticulously followed the DSM in making his diagnosis, but that does not equate to a finding that Wendy did not have a record of generalized anxiety disorder, as the defendants appear to suggest. Indeed, the court expressly rejected all of the defendants' challenges to the validity of LaPointe's diagnosis, concluding that LaPointe "was qualified by education and experience to testify as an expert within his field, including the diagnosis of 'emotional disorders, whether cognitive, affective, or behavioral' in the context of marriage and family systems" pursuant to § 7-2 of the Connecticut Code of Evidence. Although the court noted that it was free to reject LaPointe's diagnosis of generalized anxiety disorder, the court accepted his diagnosis because it was "persuaded that he made his diagnosis in good faith based on his personal observations of [Wendy] in therapy sessions." The court, however, emphasized that the accuracy of LaPointe's diagnosis was not the dispositive issue because "the definition of 'mental disability' in § 46a-51 (20) . . . includes any individual 'who has a record of, or is regarded as having one or more mental disorders,' as defined in the DSM." Although the court's final statement on this issue was that "[b]ecause the defendants treated [Wendy] as having a disability . . . the plaintiffs have proved that [Wendy] was a person with a mental disability within the meaning of § 46a-51 (20)," we will not ignore its other finding that LaPointe, in good faith, made a record of her mental disorder as defined in the DSM.

Given this analysis regarding LaPointe's diagnosis and the defendants' challenges thereto, coupled with the court's continued references to the "record of" prong in § 46a-51 (20), we read the court's decision as finding that Wendy has a record of having generalized anxiety disorder as defined in the DSM. Although the defendants emphasize that the court did not expressly

state that the plaintiffs had met their burden of establishing this fact, that conclusion is clearly implied by the court's extensive discussion and ultimate rejection of the defendants' challenges to LaPointe's testimony and diagnosis. See *Alpha Beta Capital Partners, L.P.* v. *Pursuit Investment Management, LLC*, supra, 193 Conn. App. 428. Simply put, when read in its entirety, the court's decision is not amenable to the defendants' limited construction. Consequently, we disagree that the court found only that Wendy was regarded as having a mental disability under § 46a-51 (20). Instead, we conclude that the court also found that Wendy has a record of having a mental disability. For this reason, the defendants' claim that a finding that the defendants regarded Wendy as having a disability is, without more, insufficient for the plaintiffs to establish a need for an accommodation necessarily fails.

In their reply brief, the defendants nevertheless assert that "all [of their] arguments . . . concerning a plaintiff who has a 'regarded as' disability apply with equal force to a person who has only a 'record of' a disability. In either case, the plaintiff's need for an accommodation must be decided based on whether the accommodation ameliorates or alleviates the 'regarded as' or 'record of' disability, not based on whether it ameliorates or alleviates whatever nondisabling condition the defendant may have mistaken for a disability." We are not persuaded.

To establish that a requested accommodation "may be necessary to afford such person equal opportunity to use and enjoy a dwelling"; General Statutes § 46a-64c (a) (6) (c) (ii); a plaintiff must demonstrate "that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." (Internal quotation marks omitted.) *Quad Enterprises Co., LLC* v. *Southold*, 369 Fed. Appx. 202, 207–208 (2d Cir. 2010); see also R. Huss,

"Pups, Paperwork, and Process: Confusion and Conflict Regarding Service and Assistance Animals Under Federal Law," 20 Nev. L.J. 785, 800–801 (2020) ("[o]nly if a person has a disability *and* there is a disability-related need for the particular animal is it necessary for a housing provider to modify a no-pets policy" (emphasis in original; footnote omitted)). Thus, to prevail on a failure to accommodate claim, there must be a disability, the effects of which can be ameliorated by the requested accommodation.

We therefore agree with the defendants that a plaintiff who does not suffer from a disability cannot establish a disability related need for an accommodation based solely on a landlord's mistaken belief that the plaintiff suffered from a disability. For example, a plaintiff who was mistakenly regarded as being blind by a prospective landlord could not establish that the landlord's refusal to allow him to move in with his dog to assist him in navigating the apartment constituted an illegal failure to accommodate because there is no disability giving rise to the need for the dog. Consistent with this reasoning, the federal regulations implementing the ADA in the employment context expressly provide that an employer is "not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong . . . ." 29 C.F.R. § 1630.9 (e) (2024). Accordingly, although the "regarded as" prong is necessary to preclude landlords from refusing to rent to prospective tenants because of perceived disabilities, a perceived disability does not give rise to the need for a reasonable accommodation.[13]

---

[13] The defendants argue that the "regarded as" prong requires that the landlord's belief as to the prospective tenant's disability be mistaken or incorrect. We do not agree. See, e.g., 29 C.F.R. 1630.2 (*l*) (1) (2024) ("an individual is 'regarded as having such an impairment' if the individual is subjected to a prohibited action because of an *actual* or perceived physical or mental impairment" (emphasis added)). In fact, in the employment context, the federal regulations state that if an employee is discriminated against

There is a difference, though, when a prospective tenant has a record of a disability. In such a circumstance, a licensed professional has determined that the individual suffers from a disability that requires an accommodation. Indeed, the regulations implementing the ADA make clear that "[w]hether an individual has a record of an impairment . . . should not demand extensive analysis." 29 C.F.R. 1630.2 (k) (2) (2024).

In the present case, the plaintiffs established that a licensed professional not only had diagnosed Wendy with a mental disorder that is defined in the most recent edition of the DSM but also continued to provide her treatment for that disorder. Accordingly, because they established that Wendy has a record of having a mental disability, there is no distinction between the "record of" prong under § 46a-51 (20) and the "actual disability" prong under the FHA for purposes of a failure to accommodate claim.

Consequently, we conclude that the court properly found that the plaintiffs satisfied their burden of proving that Wendy has a "record of" having a mental disability within the meaning of § 46a-51 (20) and, therefore, properly proceeded to consider whether the plaintiffs had established the third element of their failure to accommodate claim—"that the accommodation [may be] necessary to afford the [disabled] person an equal opportunity to use and enjoy the dwelling . . . ." *Olsen* v. *Stark Homes, Inc.*, supra, 759 F.3d 156.

II

The defendants claim that the court improperly concluded that two emotional support dogs may be necessary for Wendy's equal use and enjoyment of the dwelling. They argue that the court committed a legal error

because he is regarded as having a disability there is no need to determine whether he has a record of a disability or actually suffers from a disability. See 29 C.F.R. 1630.2 (g) (3) (2024) ("[w]here an individual is not challenging a covered entity's failure to make reasonable accommodations and does not require a reasonable accommodation, it is generally unnecessary to

by applying an improperly expansive definition of "necessary" to the plaintiffs' failure to accommodate claim.

The following additional facts, as found by the trial court, are relevant to the defendants' claim. The court found that "[t]he evidence established that the defendants had initially granted the Pizzoferratos' request and only later claimed that the approval was limited to one dog. Other evidence included [LaPointe's] note to Vintage (also supplied to Mansions) that [Wendy] needed her two canines to relieve her symptoms of anxiety. [Wendy] testified that the dogs had different personalities that helped her in different ways: Chloe, a fourteen year old dog, would recognize when [Wendy] was stressed and would cuddle up on her chest and bop her nose; Mitsie, a twelve year old dog, would try to engage [Wendy] to engage in active play when [Wendy] was distressed." (Internal quotation marks omitted.)

Relying on regulatory guidance from the Department of Housing and Urban Development (HUD) concerning emotional support animals and *Bhogaita* v. *Altamonte Heights Condominium Assn.*, *Inc.*, 765 F.3d 1277 (11th Cir. 2014), the court concluded that the plaintiffs' evidence was sufficient to establish that two dogs were necessary for Wendy's use and enjoyment of the dwelling. Specifically, the court reasoned as follows. "In a final rule published as 'Pet Ownership for the Elderly and Persons with Disabilities,' 73 Fed. Reg. 63,834-01, HUD discussed the necessity element of a reasonable accommodation claim . . . . [HUD stated that] '[h]ousing providers are entitled to verify the existence of the disability, and the need for the accommodation—if either is not readily apparent. Accordingly, persons

proceed under the 'actual disability' or 'record of' prongs"). Regardless of his actual disability status, the employee was subjected to discrimination due to the employer's subjective belief, whether or not that belief was correct.

who are seeking a reasonable accommodation for an emotional support animal may be required to provide documentation from a physician, psychiatrist, social worker, or other mental health professional that the animal provides support that alleviates at least one of the identified symptoms or effects of the existing disability. . . . [E]motional support animals do not need training to ameliorate the effects of a person's mental and emotional disabilities. Emotional support animals by their very nature, and without training, may relieve depression and anxiety, and/or help reduce stress-induced pain in persons with certain medical conditions affected by stress.'

"HUD's comments . . . indicate that an emotional support animal may be considered 'necessary' for purposes of the [FHA] if the animal 'provides support that alleviates at least one of the identified symptoms or effects of the existing disability.' Its position is reflected in federal decisions involving emotional support animals. For instance, in *Bhogaita* v. *Altamonte Heights Condominium Assn., Inc.*, supra, 765 F.3d 1289, the [United States Court of Appeals for the] Eleventh Circuit summarized the 'necessity' element of a failure to accommodate claim involving an emotional support animal as whether the plaintiff 'offered sufficient evidence that having the dog would affirmatively enhance his quality of life by ameliorating the effects of his disability.' . . .

"[Thus] HUD considers an emotional support animal to provide a disability related benefit if it 'ameliorates' even one of the symptoms of the person's disability. . . . Federal cases are replete with instances in which . . . providers have supported a patient's need for an emotional support animal to relieve symptoms of anxiety or depression. See, e.g., *Bhogaita* v. *Altamonte Heights Condominium Assn., Inc.*, supra, 765 F.3d

1281 (plaintiff's treating psychiatrist provided three letters to housing provider explaining that plaintiff had 'therapeutic relationship' with his specific dog, emotional support animal that served to 'ameliorate otherwise difficult to manage day to day psychiatric symptoms'); *Warren* v. *Delvista Towers Condominium Assn., Inc.*, 49 F. Supp. 3d 1082, [1084] (S.D. Fla. 2014) (plaintiff's psychiatrist, who diagnosed plaintiff with severe depression and post-traumatic stress disorder, 'strongly recommended' that housing provider allow patient to keep emotional support animal because of the dog's 'therapeutic use and function'); [see also] *Castellano* v. *Access Premier Realty, Inc.*, 181 F. Supp. 3d 798, [805, 807] (E.D. Cal. 2016) (plaintiff's treating physician declared that plaintiff suffered from anxiety disorder and depression that would be eased by emotional support animal); *Chavez* v. *Aber*, 122 F. Supp. 3d 581, 587 (W.D. Tex. 2015) (psychiatrist for plaintiff's mentally disabled child recommended that child's treatment should include use of emotional support animal). . . .

"The plaintiffs' evidence of the necessity of two dogs is not overwhelming, but it is, all things considered, sufficient to meet their burden of proof by a fair preponderance of the evidence. As the decision in *Bhogaita* suggests, an individual's relationship with a *specific* animal can have particular benefit. In this case, [Wendy] testified that she relied on the two dogs for different types of comfort and support when she had panic attacks. The court is persuaded that each dog ameliorated one or more of the symptoms of her anxiety disorder, and, in that sense, each was necessary for her equal use and enjoyment of the dwelling, as such necessity has been explained by HUD and by federal court decisions in reliance on HUD's guidance." (Emphasis in original.)

On appeal, the defendants argue that the court "adopted a legally incorrect definition of necessity" and "incorrectly held that the accommodation was necessary because it made [Wendy] feel better, not because without both dogs, [Wendy] could not equally use and enjoy the apartment." Specifically, they argue that the court misconstrued *Bhogaita* v. *Altamonte Heights Condominium Assn., Inc.*, supra, 765 F.3d 1281, "to mean that having two dogs was 'necessary' if [the dogs] did no more than provide 'comfort and support when she had panic attacks.' . . . *Bhogaita* requires more. . . . To alleviate or ameliorate the effect of a disability requires more than just making the plaintiff feel better; it requires that the accommodation alleviate the condition that makes the plaintiff disabled. . . . This is consistent with the decision the trial court rejected, *Cinnamon Hills Youth Crisis Center, Inc.* v. *Saint George City*, 685 F.3d 917 (10th Cir. 2012)." (Citations omitted.) The plaintiffs respond that, on the basis of Wendy's testimony at trial, the court properly held that both of Wendy's two assistance animals were necessary for her equal use and enjoyment of the dwelling. We conclude that the court applied an incorrect legal standard in concluding that both dogs were necessary.

Whether the court applied the correct legal standard in determining that two emotional support dogs were necessary pursuant to § 46a-64c (a) (6) (C) (ii) "presents an issue of statutory construction that raises a question of law, over which we exercise plenary review." *Lopez* v. *William Raveis Real Estate, Inc.*, supra, 343 Conn. 42.

In accordance with § 1-2z, we begin our analysis with the text of the statute, which provides in relevant part: "For purposes of this subdivision, discrimination includes . . . (ii) a refusal to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford such

person equal opportunity to use and enjoy a dwelling
. . . .'' General Statutes § 46a-64c (a) (6) (C) (ii).

The FHA likewise provides that housing discrimina-
tion includes, among other things, the "refusal to make
reasonable accommodations in rules, policies, prac-
tices, or services, when such accommodations may be
necessary to afford such person equal opportunity to
use and enjoy a dwelling . . . .'' 42 U.S.C. § 3604 (f) (3)
(B) (2024). This provision requires "that the requested
modification or accommodation be reasonable and that
the [denial] result . . . in so diminishing [the disabled]
person's use and enjoyment of the premises as to consti-
tute a denial of equal opportunity.'' *Austin* v. *Farm-
ington*, 826 F.3d 622, 627 (2d Cir.), cert. denied, 580
U.S. 962, 137 S. Ct. 398, 196 L. Ed. 2d 297 (2016).

"A reasonable accommodation under the [FHA] may
include the use of an emotional support animal in one's
own home, despite the existence of a rule, policy or
law prohibiting such an animal. See, e.g., *Castillo* [*Con-
dominium Assn.*] v. *U.S.* [*Dept.*] *of Housing & Urban
Dev*[*elopment*], 821 F.3d 92, 100 (1st Cir. 2016); *Ander-
son* v. [*Blue Ash*], 798 F.3d 338, 363 (6th Cir. 2015);
*Bhogaita* v. *Altamonte Heights* [*Condominium Assn.*],
*Inc.*, [supra, 765 F.3d 1289].'' *Revock* v. *Cowpet Bay West
Condominium Assn.*, 853 F.3d 96, 110 (3d Cir. 2017).[14]

---

[14] As the Michigan Court of Appeals recently observed in *Riverbrook* v.
*Fabode*, 333 Mich. App. 645, 963 N.W.2d 415 (2020), aff'd in part, vacated
in part, 510 Mich. 1061, 981 N.W.2d 468 (2022), "[i]n recent years, govern-
ments have allowed people with psychological disabilities to register 'Emo-
tional Support Animals' . . . to help them navigate the world. This designa-
tion is more fluid than that of a service dog used to assist the blind or others
with physical needs. And the fuzzy edges of these laws have spawned abuse.
We have all heard the tales: a woman claiming a disability who tried to
bring an emotional support peacock in the main cabin on a flight, or the
United States Department of Transportation requiring airlines to permit
emotional support miniature horses on passenger airliners. Landlords have
also felt the fallout from 'emotional support animal' abuses, with tenants
purchasing [emotional support animal] certification online to dodge pet
prohibitions in their leases.'' (Footnote omitted.) Id., 647–48.

The Michigan Court of Appeals emphasized that "[t]he statute does not

Although neither this court nor our Supreme Court has considered the meaning of "necessary" in § 46a-64c (a) (6) (C) (ii), several federal appellate courts have construed the same requirement under 42 U.S.C. § 3604 (f) (3) (B). See *Commission on Human Rights & Opportunities* v. *Savin Rock Condominium Assn., Inc.*, 273 Conn. 373, 386, 870 A.2d 457 (2005) ("[i]n construing a Connecticut statute that is similar to federal law, we often turn to decisions construing the federal law for guidance"). The United States Court of Appeals for the Third Circuit conducted an extensive textual analysis of the same statutory language in *Vorchheimer* v. *Philadelphian Owners Assn.*, 903 F.3d 100, 105–109 (3d Cir. 2018). In that case, the plaintiff, a disabled resident in the defendant's building, "wanted to leave [her rolling walker] in her building's lobby. The building managers refused, but offered her four other ways to store and access her walker. She sued under the [FHA], claiming that her preferred accommodation was necessary to equally enjoy her home. The District Court dismissed her complaint, holding that she had not plausibly pleaded necessity." Id., 103.

In affirming the judgment, the Third Circuit reasoned that " '[n]ecessary' is a '[word] of limitation.' . . .  As an adjective, it means '[i]ndispensable, requisite, essential, needful; that cannot be done without,' or 'absolutely required.' . . .  The other sense of the adjective is causal: 'Inevitably determined or fixed by predestination or the operation of natural laws; happening or existing by an inherent necessity.' . . .  So the word

provide that a tenant may automatically establish a handicap and a need for an [emotional support animal] with a simple letter or that the court may not delve into the accuracy or legitimacy of the diagnosing party's opinion. . . . [T]he court *must* carefully consider the reliability of the methods employed by [the medical professional], as well as her final opinion. Only then can the district and circuit courts determine if [the landlord] refused to make a reasonable accommodation for a tenant with a disability or handicap." (Emphasis in original.) Id., 659–60.

'necessary,' without more, is stringent. . . . Necessities do not include conveniences and creature comforts, much as they are desirable or even helpful.

\* \* \*

"The statute applies 'when such accommodations may be necessary,' but 'may' does not change our analysis. . . . In this statute, 'may' signals not a low probability of necessity, but rather the conditional mood. The condition, when met, makes the accommodation necessary, as in the phrase 'as the case may be.' '[W]hen such accommodations may be necessary' in [42 U.S.C.] § 3604 (f) (3) (B) is another way of saying 'whenever they are necessary' or 'as far as they are necessary.' In short, the . . . necessity element requires that an accommodation be essential, not just preferable. . . .

"Necessity tracks an underlying need or goal. . . . [Section 3604 (f) (3) (B) of title 42 of the United States Code] tells us what to look for: an 'accommodation . . . [that] may be necessary to afford [the disabled] person equal opportunity to use and enjoy a dwelling.' . . . The text pegs the necessity to the goal of providing the particular tenant with equal housing opportunity. . . . 'Think of the blind woman who obtains an exemption from a "no pets" policy for her seeing eye dog, or the paraplegic granted special permission to live on a first floor apartment because he cannot climb the stairs.' . . . The blind woman's need is a way to navigate to and around her apartment. The paraplegic's need is a way to get to his apartment. Once we identify the particular tenant's need, we can gauge what is necessary to afford that tenant equal housing opportunity. . . .

"Giving the paraplegic a first-floor apartment is one way to give him access and thus equal opportunity to use his apartment. But an elevator would work too.

That alternative would give him access to every apartment, so a first-floor apartment would no longer be necessary. The landlord has to offer at least one of the accommodations, but not both. If she does offer one of them, she has not 'refus[ed] to make reasonable accommodations . . . [that] may be necessary to afford [the tenant] equal [housing] opportunity.' . . . In that vein, food is necessary to survive. But if soup and salad are on offer, a sandwich is not necessary. Gauging necessity, then, requires considering whether another alternative on offer satisfies the goal of equal housing opportunity for that tenant.

\* \* \*

"Of course, the proffered alternatives must still satisfy the remainder of the subsection's third element: affording equal housing opportunity. That may require more than 'just those accommodations that are absolutely necessary for the disabled individual's treatment or basic ability to function.' . . . To qualify as alternative 'reasonable accommodations,' the accommodations must afford the particular disabled person equal opportunity both to use and to enjoy her home. An accommodation that does not provide equal opportunity, or that provides equal opportunity to use but not to enjoy, will not satisfy that requirement.

"So courts must weigh whether the tenant's requested accommodation and the landlord's proposed alternative afford equal housing opportunity. Whether the accommodations do so depends on that particular tenant's abilities and disability, which may require a fact-intensive inquiry. But all the proffered alternatives that afford equal opportunity to use and to enjoy housing bear on whether a specific accommodation is necessary." (Citations omitted; emphasis omitted.) *Vorchheimer* v. *Philadelphian Owners Assn.*, supra, 903 F.3d 105–109.

The Third Circuit also observed that "sister-circuit precedent adopts the strict sense of 'necessary.' As then-Judge Gorsuch recognized, 'necessary' in [42 U.S.C.] § 3604 (f) (3) (B) bears its ordinary meaning: 'The word implies more than something merely helpful or conducive. It suggests instead something "indispensable," "essential," something that "cannot be done without." *Cinnamon Hills* [*Youth Crisis Center, Inc.* v. *Saint George City*, supra, 685 F.3d 923]. 'Put simply, the statute requires accommodations that are necessary (or indispensable or essential) to achieving the objective of equal housing opportunities between those with disabilities and those without.' . . .

"Other circuits make the same point using the language of causation. Necessity functions as a but-for causation requirement, tying the needed accommodation to equal housing opportunity. An accommodation is necessary if, 'without the accommodation, the plaintiff will be denied an equal opportunity to obtain [or use, or enjoy] the housing of her choice.' [*Wisconsin Community Services, Inc.* v.] *Milwaukee*, 465 F.3d 737, 749 (7th Cir. 2006) (en banc); accord id. . . . 754–55 ('cause-in-fact' and 'but for' cause); *Anderson* [v. *Blue Ash*, supra, 798 F.3d 361] ('but for . . . causation inquiry' . . . ); see also [*Lapid-Laurel, LLC* v. *Zoning Board of Adjustment*, 284 F.3d 442, 460 (3d Cir. 2002)] (quoting other circuits' cases adopting . . . 'but for . . . causation requirement'). Cf. *Bhogaita* v. *Altamonte Heights* [*Condominium Assn., Inc.*, supra, 765 F.3d 1289] (upholding . . . jury verdict for plaintiff because, 'without the [emotional-support] dog [sought], [the plaintiff's] social interactions would be so overwhelming that he would be unable to perform work of any kind' . . . ). In short, these precedents confirm our . . . reading of the plain text." *Vorchheimer* v. *Philadelphian Owners Assn.*, supra, 903 F.3d 110.

Applying this construction in *Vorchheimer*, the court concluded that the District Court properly dismissed the plaintiff's complaint, reasoning that, "[t]o enjoy her home, [the plaintiff] needed access to her walker without having to stand for minutes. She pleaded four alternatives on offer that, on their face, satisfied those needs. And she attached doctors' letters that distinguish her needs from her preferences. Because the [federal fair housing laws guarantee] her only a 'reasonable accommodation' that satisfies her needs, not the particular accommodation that she wanted, we will affirm." Id., 113.

In the present case, the trial court rejected the defendants' reliance on *Vorchheimer* v. *Philadelphian Owners Assn.*, supra, 903 F.3d 105–109, and *Cinnamon Hills Youth Crisis Center, Inc.* v. *Saint George City*, supra, 685 F.3d 917.[15] Instead, the court found persuasive the

---

[15] The plaintiffs contend that "[t]he [United States Courts of Appeals for the] Sixth, Seventh, Ninth, and Eleventh Circuits have [held] that a reasonable accommodation is necessary when it 'ameliorates' or 'alleviates' the effects of the disability," whereas "[t]he [United States Courts of Appeals for the] Third, Fifth, and Tenth Circuits have adopted a higher standard, holding that an accommodation is necessary when it is 'required,' 'indispensable,' or 'essential.' "

Our research, however, reveals that the Sixth and Ninth Circuits have embraced the "higher standard" for necessity, citing both *Vorchheimer* and *Cinnamon Hills Youth Crisis Center, Inc.*, with approval. See *Howard* v. *HMK Holdings, LLC*, 988 F.3d 1185, 1190 (9th Cir. 2021) ("Necessary suggests something that cannot be done without. . . . Thus, the inquiry is a causal one that examines whether the requested accommodation . . . would redress injuries that otherwise would prevent a disabled resident from receiving the same enjoyment from the property as a non-disabled person would receive." (Citations omitted; internal quotation marks omitted.)); *Davis* v. *Echo Valley Condominium Assn.*, 945 F.3d 483, 490 (6th Cir. 2019) ("[A] total smoking ban likely was not necessary (that is, indispensable, essential, something that cannot be done without) to give [the plaintiff] the same opportunity to use and enjoy her condo as compared to a non-disabled person who dislikes the smell of smoke. . . . [T]he law does not require *more* or *better* opportunities for those with handicaps as compared to those without . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.)), cert. denied,      U.S.     , 141 S. Ct. 162, 207 L. Ed. 2d 1099 (2020).

reasoning of the Eleventh Circuit in *Bhogaita* v. *Alta-monte Heights Condominium Assn., Inc.*, supra, 765 F.3d 1289.

In *Bhogaita*, the plaintiff, Ajit Bhogaita, was "a United States Air Force veteran who suffer[ed] from post-traumatic stress disorder (PTSD) that developed after a sexual assault he endured during his military service. In 2001, Bhogaita bought a condominium unit managed by the [defendant (Association)] and subject to its rules. Among those rules, the Association prohibited occupants from keeping dogs weighing more than twenty-five pounds. In 2008, Bhogaita acquired a dog, Kane, that exceeded the weight limit. Though no medical professional prescribed the dog initially, Bhogaita's psychiatric symptoms improved with Kane's presence, so much so that Bhogaita began to rely on the dog to help him manage his condition. He kept the dog for the next two years.

"On May 4, 2010, the Association demanded that Bhogaita remove Kane from his unit, pursuant to the weight limit. Bhogaita responded by providing the first of three letters from Dr. Shih-Tzung Li, his treating psychiatrist, explaining that the dog was an emotional support animal. The first letter, written on May 7, read in relevant part:

"Due to mental illness, Mr. Bhogaita has certain limitations regarding social interaction and coping with

---

We also note that the Eighth Circuit has adopted the "higher standard," explaining: "Necessity is a high standard under the FHA and the ADA. . . . Necessary means something indispensable, essential, something that cannot be done without. . . . [It] require[s] accommodations that are necessary (or indispensable or essential) to achieving the objective of equal housing opportunities between those with disabilities and those without. . . . [I]f the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be necessary." (Citations omitted; internal quotation marks omitted.) *One Love Housing, LLC* v. *Anoka*, 93 F.4th 424, 433 (8th Cir. 2024).

stress and anxiety. In order to help alleviate these diffi-culties, and to enhance his ability to live independently and to fully use and enjoy the dwelling unit, I am pre-scribing an emotional support animal that will assist Mr. Bhogaita in coping with his disability. . . .

"In the second letter, sent days later, Dr. Li added specific information about the dog. He wrote that Bho-gaita has a therapeutic relationship with this specific dog, Kane. As an emotional support animal, Kane serves to ameliorate otherwise difficult to manage day to day psychiatric symptoms in Mr. Bhogaita. . . . In July, the Association responded by sending Bhogaita its first request for additional information regarding his disabil-ity and the need for accommodation. . . .

"Bhogaita responded later that month by providing a third letter from Dr. Li, in which the doctor indicated the nature and cause of the disability for the first time: He was treating Bhogaita for [a]nxiety related to mili-tary trauma. . . . Dr. Li explained further [that] [Bho-gaita's condition] limits his ability to work directly with other people, a major life activity. Currently he has been hired to perform technical support work from home. He is able to work with the assistance of his emotional support animal. Otherwise his social interactions would be so overwhelming that he would be unable to perform work of any kind. I am familiar with the therapeutic benefits of assistance animals for people with disabili-ties such as that experienced by Mr. Bhogaita. Upon request, I would be happy to answer other questions you may have concerning my recommendation that Mr. Bhogaita have an emotional support animal. Should you have additional questions, please do not hesitate to contact me. . . .

"Shortly thereafter, Bhogaita also sent a response to the Association in which he answered the Association's questions in turn. Bhogaita identified his diagnosis and

incorporated by reference Dr. Li's third letter to explain how his PTSD affects major life activities. . . . After receiving Dr. Li's three letters . . . the Association sent Bhogaita a second request for information on August 17, 2010. . . . Nearly two and a half months passed, during which time Bhogaita did not respond. On November 3, 2010, the Association sent a third request for information, this time requesting a sworn statement from Dr. Li to include specific facts [regarding the nature of the disability and the duration and extent of Dr. Li's treatment]. . . . That letter went on to state that Bhogaita was to respond by December 6, and if he did not, the letter would serve as the Association's formal demand for [Bhogaita] to remove any dogs over [twenty-five pounds] from [his] unit no later than December 10, 2010. . . .

"Rather than responding, Bhogaita filed a complaint with [HUD] and the Florida Commission on Human Relations . . . . He claimed that the Association's conduct amounted to a failure to make a reasonable accommodation in violation of the disability provisions of the [state and federal fair housing laws]. In January 2011, [both agencies] issued findings of cause against the Association. Accordingly, the Association agreed to allow Bhogaita to keep Kane. . . .

"In October 2011, Bhogaita brought suit. On the Association's motion, the district court dismissed Bhogaita's claim of disability discrimination brought under 42 U.S.C. § 3604 (f) (2), while his reasonable accommodation claim, under [42 U.S.C.] § 3604 (f) (3) and analogous Florida law, survived. . . .

"A two-day jury trial followed. . . . After presentation of the evidence, the jury returned a verdict in favor of Bhogaita: It found that Bhogaita was disabled and requested an accommodation for his disability, that the accommodation was necessary and reasonable, and

that Bhogaita suffered damages because of the Association's refusal to accommodate." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Bhogaita* v. *Altamonte Heights Condominium Assn., Inc.*, supra, 765 F.3d 1281–84.

The Association appealed, claiming, among other things, that Bhogaita failed to present sufficient evidence to demonstrate that the requested accommodation was necessary. Id., 1288. In rejecting that claim, the Eleventh Circuit explained that "[a] successful [reasonable] accommodation claim requires that the accommodation sought be necessary to afford [the claimant] equal opportunity to use and enjoy the relevant dwelling. . . . The word equal is a relative term that requires a comparator to have meaning. . . . Under the FHA, the comparator is a person without a disability, and an accommodation extends an equal opportunity when it addresses the needs the disability creates. . . . Thus, a necessary accommodation is one that alleviates the effects of a disability. . . . The jury was properly instructed to that effect." (Citations omitted; internal quotation marks omitted.) Id. The District Court had instructed the jury that "[t]o prove that the desired accommodation is necessary, [Bhogaita] must show, at a minimum, that the accommodation would affirmatively enhance [his] quality of life by ameliorating (or reducing) the effects of his disability." (Internal quotation marks omitted.) Id., 1290.

Notably, the Eleventh Circuit explained that "[s]ome other arrangement, such as having a lighter-weight dog permitted by the Association's policy, might similarly alleviate Bhogaita's symptoms, and evidence of such could be relevant to the reasonableness determination, which asks whether the requested accommodation 'is both efficacious and proportional to the costs to implement it.' . . . It is not, however, relevant to the necessity determination, which asks whether the requested

accommodation ameliorates the disability's effects. . . . Both necessity and reasonableness are required . . . but in this appeal, the Association does not raise the issue of reasonableness with respect to Bhogaita's requested accommodation. For that reason, we do not engage in the highly fact-specific reasonableness inquiry, which would require a balancing of the parties' needs. . . . The question we address is a different, more limited one: whether Bhogaita offered sufficient evidence that having the dog would affirmatively enhance his quality of life by ameliorating the effects of his disability." (Citations omitted.) Id., 1289.

As to that limited question, the court reasoned that "Bhogaita produced evidence from which a reasonable fact finder could conclude that his dog alleviated the effects of his [post-traumatic stress disorder]. Specifically, Dr. Li's letters said that Kane assists Bhogaita in coping with his disability . . . and ameliorate[s] Bhogaita's psychiatric symptoms . . . and that without the dog, Bhogaita's social interactions would be so overwhelming that he would be unable to perform work of any kind. . . . In sum, the letters directly support the jury's verdict: The requested accommodation was necessary to afford [Bhogaita] an opportunity to use and enjoy the dwelling." (Citations omitted; internal quotation marks omitted.) Id.

We agree with the Eleventh Circuit's reasoning in *Bhogaita* that "a necessary accommodation is one that alleviates the effects of a disability." (Internal quotation marks omitted.) Id., 1288. We disagree, however, with the court's reasoning that consideration of alternative proffered accommodations is not part of the necessity determination. Instead, we agree with the textual analysis of the Third Circuit in *Vorchheimer* and likewise conclude that, under § 46a-64c, the plain meaning of the word "necessary" requires courts to consider "all the proffered alternatives that afford equal opportunity

to use and to enjoy housing" in deciding whether a specific accommodation is necessary. *Vorchheimer* v. *Philadelphian Owners Assn.*, supra, 903 F.3d 109; see also *Wilkison* v. *Arapahoe*, 302 Neb. 968, 981–82, 926 N.W.2d 441 (2019) ("[T]he . . . necessity element requires that an accommodation be essential to the equal enjoyment from the property, not just preferable. The plain meaning of necessary requires courts to consider the alternatives on offer." (Footnote omitted; internal quotation marks omitted.)).

Accordingly, although the fair housing laws require "reasonable accommodations necessary for a disabled individual to receive the *same* enjoyment from the property as a non-disabled person would receive [and] not merely those accommodations that the disabled individual cannot function without or for which no alternative is available away from the dwelling"; (citation omitted; emphasis in original; internal quotation marks omitted) *Anderson* v. *Blue Ash*, supra, 798 F.3d 361; the plain meaning of "necessary" requires that the accommodation be *essential* to the equal enjoyment of the dwelling, "not just preferable." *Vorchheimer* v. *Philadelphian Owners Assn.*, supra, 903 F.3d 107.[16]

In the present case, this standard required the court to consider whether the available alternative offered by the defendants of allowing the Pizzoferratos to have one emotional support dog satisfied Wendy's needs and thereby afforded her an equal opportunity to use and enjoy the dwelling. The court did not engage in this specific inquiry. Instead, it relied on Wendy's testimony "that she relied on the two dogs for different types of

---

[16] For the same reason, we are not persuaded by the trial court's reliance on the HUD guidance. The fact that *an* emotional support animal is a necessary accommodation because it ameliorates one or more symptoms of a disability does not mean that, because several additional dogs each also ameliorates the same symptoms, *all* such dogs are necessary for that purpose.

comfort and support when she had panic attacks" to conclude that it was "persuaded that each dog ameliorated one or more of the symptoms of her anxiety disorder, and in that sense, each was necessary for her equal use and enjoyment of the dwelling, as such necessity has been explained by HUD and by federal court decisions in reliance on HUD's guidance."

The problem with the court's analysis is that there was no evidence that Wendy suffered from either different types of anxiety or different symptoms of the same anxiety that required different types of emotional support. As noted by the trial court, the only evidence regarding how Wendy's two dogs alleviated the symptoms of her generalized anxiety disorder was Wendy's testimony that one dog would engage her in play while the other would cuddle up and "bop" her on the nose. Her testimony provided some detail on the connection between her anxiety and the two dogs, explaining that, "[i]f I get—feel an anxiety coming, if I can, I try to bring my dogs around me. But actually, they notice it hopefully before I notice it. . . . [A]nimals can actually read the chemical balance. They sense that in your brain. So, if I started acting nervous or something, Chloe, which was one of my dogs, would climb up on my chest and actually give me a bop with her nose. And [Mitsie] was more of an active interactive. That's why I had two of them. She would bring a tennis ball and try to play soccer with me to take—it was to take my mind off of what was making me anxious. . . .

"[E]very dog has a different personality, and one dog was more of a I'm going to cuddle up, I'm going to bop you, I'm going to try to get you to hug me, where the other dog would be come on, let's forget about this, let's go play, let's get active, let's go somewhere else." Consequently, the only evidence of how the dogs emotionally supported Wendy was that they both reacted to her anxiety and provided relief for the same anxiety

but in different ways. There was no evidence that Chloe's hugging was at times ineffective and Mitsie's playing was required or vice versa.[17] Put another way, the court relied on the fact that both dogs could be helpful in alleviating Wendy's anxiety but never considered whether having both dogs was necessary because, for example, neither dog could be effective all of the time.

We also find it significant that LaPointe provided no meaningful evidence regarding the connection between Wendy's generalized anxiety disorder and the need for two dogs. In exhibit 1, the 2018 certification that LaPointe provided for Wendy certifying that she had a disability and required a reasonable accommodation, LaPointe wrote: "This therapist is verifying that Wendy . . . suffers from moderate anxiety and that her two canines provide relief." He did not state that the dogs were *necessary* to ameliorate her anxiety or, if an emotional support animal was necessary, why one dog would not be sufficient. Furthermore, he testified that he has no training regarding emotional support animals or other therapeutic uses of animals and that he neither prescribed nor recommended that Wendy get an emotional support animal because "[s]he already had two dogs." This evidence stands in stark contrast to the evidence presented in other cases involving emotional support animals, where courts have found sufficient evidence of necessity for the requested accommodation.

---

[17] Wendy testified that her dog Chloe died "about two years" before the trial and that she effectively replaced Chloe with her son's cat, Ivory, which her son had left with the Pizzoferratos when he moved out of state. She explained that Ivory "thinks it's a dog," she "did some work with it," and now "it's working out pretty well." She further explained that Chloe was "the bopper that would crawl on [her] nose. And the cat's name is Ivory, and he's the one that—he crawls up and is right in [her] face." There was no evidence that LaPointe or any other licensed professional has determined that Ivory is necessary, in addition to Mitsie, to ameliorate the effects of Wendy's generalized anxiety disorder.

In *Bhogaita*, for example, the court observed that "Dr. Li's letters said that Kane assists Bhogaita 'in coping with his disability' . . . and 'ameliorate[s]' Bhogaita's 'psychiatric symptoms' . . . and that without the dog, Bhogaita's 'social interactions would be so overwhelming that he would be unable to perform work of any kind.' " (Citations omitted.) *Bhogaita* v. *Altamonte Heights Condominium Assn., Inc.*, supra, 765 F.3d 1289. Similarly, in *Hollandale Apartments & Health Club, LLC* v. *Bonesteel*, 173 App. Div. 3d 55, 100 N.Y.S.3d 711 (2019), the New York Supreme Court, Appellate Division, held that a tenant established that an emotional support dog was necessary under the FHA where the tenant "and his therapist testified that an emotional support dog would alleviate some of his symptoms of depression and anxiety. The therapist testified that an emotional support dog would ameliorate the loneliness and isolation of [the tenant's] life by providing him with companionship and unconditional affection. She further opined that the dog would alleviate the lack of structure in [the tenant's] life and help to move his sleep schedule toward a more normal pattern by requiring him to feed and walk the dog at regular intervals each day. The therapist noted that [the tenant] had followed a more structured schedule when he was still living in his family home, in part because he was then responsible for feeding and walking the family dogs, and that, after he moved out, he returned to the house when necessary to continue caring for and exercising the dogs until his former wife moved away. Owning a dog would require [the tenant] to engage in regular exercise, which the therapist described as 'one of the primary behavioral treatments for depression,' and would allow him to make better use of the grounds surrounding the apartment complex. She testified that a dog's companionship could alleviate [the tenant's] social anxiety and act as a 'security blanket,' increasing

his confidence and willingness to interact with other people, and would also facilitate social interaction by offering opportunities to meet other people while outdoors with the dog. The therapist opined that increased exercise and social interaction have been shown to have similar effects to antidepressant medication in alleviating depression and anxiety, and that increased energy levels arising from exercise and enhanced social interactions would improve [the tenant's] motivation to engage in various activities of daily life." Id., 66.

Considering the evidence presented to establish the necessity of one dog in those cases, the lack of evidence regarding necessity as to the second dog in the present case is readily apparent. The plaintiffs' evidence certainly demonstrated that having both of her dogs as opposed to only one was preferable, but there was no evidence to demonstrate that it was essential. In other words, proof that a requested accommodation is preferable to the plaintiff in alleviating the effects of a disability and thereby enhances her enjoyment of her dwelling is insufficient to prove that the preferred accommodation is necessary. Thus, the fact that each dog alleviated the effects of Wendy's disability, albeit in different ways, was not sufficient to demonstrate that the accommodation for a second dog was necessary, i.e., indispensable, to afford her an equal opportunity to use and enjoy the dwelling.

In sum, we conclude that the court erred in that the definition of necessary it applied was so broad as to include preference, thereby diluting the plaintiffs' burden of proof. Therefore, the court incorrectly concluded that the plaintiffs met their burden as to the third element of their failure to accommodate claim. Furthermore, because the evidence submitted by the plaintiffs, viewed in the light most favorable to the plaintiffs, was insufficient as a matter of law to prove that both dogs were necessary to ameliorate the effects of Wendy's

generalized anxiety disorder, the court should have rendered judgment for the defendants. See, e.g., *Cokic* v. *Fiore Powersports, LLC*, 222 Conn. App. 216, 231–32, 304 A.3d 179 (2023) (new hearing on defendant's motion for attorney's fees was not warranted notwithstanding court's failure to make necessary findings because defendant failed to present evidence to support required findings).

The judgment is reversed and the case is remanded with direction to render judgment for the defendants.

In this opinion the other judges concurred.